893 F.2d 40
 The UNITED STATES
v.
Robert Thomas SKELTON a/k/a Tommy Skelton, a/k/a Tommy Hayes
Skelton, Donna Tozzi a/k/a Donna E. Skelton, Dean
Anthony Tozzi, Alan Frank a/k/a A. Roy,
John A. Koval, Sr.
Appeal of UNITED STATES of America.
 No. 89-3456.
 United States Court of Appeals,
Third Circuit.
 Argued Dec. 12, 1989.
Decided Jan. 8, 1990.
Rehearing and Rehearing In Banc Denied Feb. 16, 1990.
 
 Charles D. Sheehy, Acting U.S. Atty., Constance M. Bowden (argued), Pittsburgh, Pa., for appellant.
 Victor H. Pribanic (argued), Pribanic and Pribanic, McKeesport, Pa., for appellees.
 Before SLOVITER, GREENBERG and SEITZ, Circuit Judges.
 OPINION OF THE COURT
 GREENBERG, Circuit Judge.
 
 
 1
 The United States, pursuant to 18 U.S.C. Sec. 3731, appeals from an order of May 31, 1989, granting appellee, Donna C. Tozzi, a new trial following her conviction under 18 U.S.C. Sec. 371, for conspiring to defraud the United States of income tax due and owing.
 
 
 2
 The circumstances leading to this appeal are as follows. An indictment was returned in the Western District of Pennsylvania charging Tozzi, and certain other defendants, with tax offenses relating to the affairs of Acme Music Company, which owned coin operated vending machines generating substantial sums of cash. The prime operator of Acme was, at least for some time, Robert Thomas Skelton, who was also indicted but who, according to the briefs, is a fugitive and has not been apprehended.[1] For some period, Tozzi was involved in the operation of the business, signing checks, handling cash, ordering parts, and signing employee withholding forms. There can be no doubt but that Acme did not file tax returns reflecting substantial sums of income.
 
 
 3
 Tozzi was tried twice. At the first trial, she was tried with a co-defendant, Alan Frank, who was convicted on two counts and acquitted on one. The jury, however, was unable to reach a verdict in her case and thus there was a mistrial as to her. At the second trial, at which she was the only defendant, the jury was given the case on October 5, 1988, after summations and the charge. On October 6, 1988, the jury advised the court that it was unable to reach a verdict, but it nevertheless continued to deliberate and, on October 7, 1988, it found Tozzi guilty.
 
 
 4
 On November 18, 1988, at the scheduled sentencing, Tozzi's attorney told the court that the previous day he had indirectly learned from an alternate juror that one of the jurors who actually deliberated had prejudicial information regarding Tozzi, which had not been revealed in the voir dire. In particular the attorney indicated that the alternate juror, Robert Gneuhs, had a few days earlier contacted John A. Koval, Sr., an employee of Acme who was a defendant named in the indictment, and had given Koval the information about the other juror. Koval, who had earlier pleaded nolo contendere and received a noncustodial sentence, testified at Tozzi's trial. Koval passed Gneuhs's information on to Tozzi's attorney. The court responded that to obtain relief Tozzi's attorney would have to file affidavits and it authorized him to obtain an affidavit from Gneuhs. The court said that, if necessary, a hearing would be held. The Assistant United States Attorney agreed with this procedure and consequently the sentencing was postponed.
 
 
 5
 On November 29, 1988, Tozzi filed a motion for a new trial, reciting that Gneuhs had, after Tozzi's trial, disclosed to Koval, who was "an acquaintance of Mr. Gneuhs," the information described in an affidavit of Gneuhs annexed to the motion. She further set forth that on November 17, 1988, her attorney met with Gneuhs and questioned him and then brought the matter to the attention of the court the next day at the sentencing hearing. According to Gneuhs's affidavit, Homer Farabaugh, a juror in the case, advised Gneuhs at the trial that he knew that Tozzi had been "booking" on the avenue at the age of 14, an activity which Gneuhs understood to involve illegal gambling. Gneuhs further recited that during the third day of the trial Farabaugh advised him that Tozzi was guilty and was not a naive person. Gneuhs stated that Farabaugh had "a distinct bias" against Tozzi. Gneuhs also indicated that he disclosed this information to Koval on November 15, 1988, and to Tozzi's attorney on November 28, 1988. It appears, therefore, that there is some confusion as to when Tozzi's attorney met with Gneuhs, as the motion recited it was on November 17, 1988.
 
 
 6
 On December 27, 1988, a status conference was held on the motion. At that time, the court indicated that approximately two weeks earlier it received a call concerning whether an Internal Revenue Service representative could question Farabaugh and take a statement from him. The court had denied that request, as it considered that the best approach would be to permit only the attorneys to question the juror. The Assistant United States Attorney then indicated that there had been a misunderstanding, as Special Agent Robert Clark of the Internal Revenue Service had already interviewed Farabaugh. The court indicated that it had not wanted that to happen and directed that Tozzi's attorney be given a written summary of the interview. The summary was then produced and it reflected Farabaugh's statement that he had not known the individuals associated with the trial, including Tozzi, and that he had not advised Gneuhs during the third day of the trial that Tozzi was guilty. He did confirm that he had spoken during the trial with Gneuhs who told him that he knew some of the witnesses and he advised Gneuhs to tell the bailiff or the judge about that.
 
 
 7
 On January 13, 1989, there was a hearing at which several witnesses testified. Gneuhs testified that he was an independent contractor. He said he had known Koval and also indicated that he knew of Skelton and "I believe I had the acquaintance with a group of people to meet with him, yes." He said he had once been called to the Acme building but had not gone there. He did, however, describe dealings he had had with Koval and Acme, and indicated that he had telephoned Acme "over the years," and over the last two years had sought donations from Acme for a women's softball team.
 
 
 8
 Gneuhs said that it "appeared very clear to me by the third day of the trial, that Mr. Farabaugh was very biased and could hardly seem objective in his decision. He [Farabaugh] indicated that Donna Tozzi was not a naive type person, that she was very street wise, and personally he had indicated to me, and I do not believe that anybody else overheard it, but that he knew of her booking on the avenue when she was younger." Gneuhs also testified that both he and Farabaugh "knew of Acme Music" and that Farabaugh "had some type of contact or personal regrets with them because of some dealings in the past. I don't know whether it was against Donna [Tozzi] or whether it was against Tom Skelton or whether it was against somebody collecting for Acme Music."
 
 
 9
 Gneuhs reiterated that Farabaugh mentioned Tozzi's bookmaking activities during the third day of the trial and that Farabaugh, in Gneuhs's "personal opinion ... had been rubbed wrong in the past and he could not be objective in his decision." Gneuhs said that even before the jury retired Farabaugh said that Tozzi was guilty and repeated that "she was not a naive person, that she was very street wise and she knew that--what was going on."
 
 
 10
 Gneuhs also explained how he had come to reveal his information. He indicated that the day after he was relieved of jury duty he was at a junk yard getting parts for his car where he told Madeline Stevens, the wife of the owner, that he had been on the jury. He described the jury to Stevens and said that one juror had been biased. It appears that this conversation occurred while the trial was still in progress because Gneuhs told Stevens that the other jurors favored Tozzi and that he expected a "hung jury."
 
 
 11
 Gneuhs further testified that around November 14 or 15, 1988, he called Koval about business and told him about the situation with the jury at the trial. He testified also that he had not anticipated that his information about the jury would have any bearing on the case.
 
 
 12
 On cross-examination, Gneuhs indicated that the Internal Revenue Service had filed a lien against him and had levied on his bank account. He admitted that he had not filed tax returns for 1985, 1986 and 1987 but claimed that he owed no taxes for those years. He also said that he helped out in a bar owned by Jules Lemal that had Acme vending machines in it. He acknowledged that he had an "association" with Koval, had played golf with him, and had solicited money from him, and sought to do business with him. Gneuhs testified that after he told Koval what happened with the jury, Koval got back in touch with him and asked if he would talk with Tozzi's attorney, which he did. He later gave the affidavit attached to the motion for the new trial.
 
 
 13
 Madeline Stevens testified that she had gone to high school with Donna Tozzi and knew Gneuhs. She said that after Gneuhs was released from the jury, he stopped by the junk yard and said "in a nutshell," "that he was worried about Donna getting a fair shake." She said that Gneuhs "was just concerned about her" and that she said "I hope things go well, too." On cross-examination, Stevens indicated that the "gist" of what Gneuhs was saying was that he hoped things would go well for Tozzi.
 
 
 14
 Robert Clark, the Internal Revenue Agent, testified that he obtained affidavits from Gneuhs and Farabaugh and that he conducted his interviews after discussing the matter with the Assistant United States Attorney. He said he had found the public lien against Gneuhs but had not examined his tax returns.
 
 
 15
 Farabaugh testified on examination by the court that he was a retired truck driver and delivery man, served on the Tozzi jury, never told an alternate juror in Tozzi's case he knew her before the case or that she had been booking on the street, did not use that term and never told an alternate juror that Tozzi was not naive and was probably guilty. On examination by Tozzi's attorney, he said he had never met, seen, or heard of Tozzi before the case. He said that he had "no idea why this man [Gneuhs] fabricated that story" regarding what he had allegedly said about Tozzi and he "was startled when [he] heard it." He also said that he had never met Gneuhs before the trial, was never alone with Gneuhs during the trial, and never said that Tozzi was not a naive person. When Clark showed him Gneuhs's affidavit, he said he "read it and started to laugh. I thought it was foolish. I never heard anything like it in my life." He said that Gneuhs's affidavit was funny "because he fabricated it. It's a total fabrication. There wasn't one part in there that I found to be anywhere near what went on, or anything else. I never went to lunch with him, I never talked with him privately or separately or anything." He said that when Gneuhs said he knew some of the people in the case he told him to tell the bailiff. He said that he was frightened when Clark contacted him but that was because a window had been broken at his house rather then because of Clark's visit.
 
 
 16
 Jules Lemal testified that he has a bar and restaurant and knows Gneuhs from golfing and from the circumstance that Gneuhs would help him out for free in his bar. He said that Gneuhs and Koval played golf together and "they seemed to be pretty close friends." He also said that Koval was involved with Acme in vending machines and he, Lemal, had Acme machines because of his association with Koval which he developed through Gneuhs.
 
 
 17
 At the conclusion of the evidence, the court said "Mr. Farabaugh was an impressive witness, quite frankly. Very impressive. He's the kind of witness that comes in here year after year in the various courts of this republic and is believed. Gneuhs, I suggest to you, is not ... Farabaugh came off as a believable witness. Gneuhs did not. He's verbose. He's wordy. He's somewhat arrogant. He has a checkered past and a close association with Koval, and he doesn't make a very good impression, to be perfectly candid with you. The body language is bad. He appears to be, quite frankly, a clever and cunning individual. Now, I suppose only the good Lord knows who is telling the truth. But, based upon their demeanor on the witness stand, Farabaugh would be believed and Gneuhs would not. It's just that simple."
 
 
 18
 The court then suggested that there could be a polygraph examination. While Tozzi's attorney agreed to this, the government pointed out that there were problems with that suggestion and the matter was dropped.[2] The court indicated that it would take the matter under advisement and that an opinion would follow.
 
 
 19
 The court ruled on the matter in a memorandum opinion of May 31, 1989. The court set forth the procedural history of the case and described the testimony at the hearing. It then said that "[w]e are faced with the allegation that a juror in the trial of Donna Tozzi was biased and failed to answer truthfully a material question on voir dire."[3] The reference to the voir dire seems to have been to a question about prior knowledge of Tozzi. The court said that the government asserted that actual juror bias had to be shown to justify the granting of a new trial, citing McDonough Power Equipment, Inc. v. Greenwood, 464 U.S. 548, 556, 104 S.Ct. 845, 850, 78 L.Ed.2d 663 (1984). The court indicated that "[t]he evidence of bias lies in the contradicted testimony of alternate juror Gneuhs." The court, citing United States v. Dean, 667 F.2d 729, 732 (8th Cir.), cert. denied, 456 U.S. 1006, 102 S.Ct. 2296, 73 L.Ed.2d 1300 (1982), then said that there is a paucity of cases in which actual juror bias is demonstrated because jurors are reluctant to admit their prejudices. The court also said that new trials should be granted on account of suspected but unproven bias only where the probability for juror bias is so great that in fairness it cannot be ignored. It indicated, citing Government of Virgin Islands v. Dowling, 814 F.2d 134, 138 (3d Cir.1987), that a defendant is entitled to a determination of guilt by an unbiased jury based solely upon evidence properly admitted in court, and that information about prior criminal convictions or activities carries great potential for prejudicing the jury.
 
 
 20
 The court said that the determination of whether a juror was biased is essentially one of credibility and therefore largely one of demeanor, citing Patton v. Young, 467 U.S. 1025, 1038, 104 S.Ct. 2885, 2892, 81 L.Ed.2d 847 (1984), but that it had "noted at the conclusion of the hearing that Farabaugh was the more credible witness." The court observed, however, that against its wishes Farabaugh had been visited by the Internal Revenue Service and his statement had been taken. The court said Farabaugh had been frightened and confused by the visit and its impact on his testimony "cannot be discounted." It then said that this court has suggested that there may be circumstances in which there can be a finding of implied bias. See United States v. Ferri, 778 F.2d 985, 993 (3d Cir.1985), cert. denied, 476 U.S. 1172, 106 S.Ct. 2896, 90 L.Ed.2d 983, 479 U.S. 831, 107 S.Ct. 117, 93 L.Ed.2d 63 (1986).
 
 
 21
 Ultimately it decided that a new trial was required for several reasons:
 
 
 22
 First, the allegations and evidence of possible juror bias are troubling. Second, the denial of impropriety by the juror must be tempered by the pre-hearing interview by agents of the government in violation of this court's order. Third, the jurors reached a verdict in the Donna Tozzi trial after nearly two days of deliberations and after notifying the court that they were unable to reach a verdict. Finally, this trial was not the first for Donna Tozzi. She was tried on the same charges earlier in the year and the jury was unable to reach a unanimous verdict.
 
 
 23
 The court concluded that Fed.R.Crim.P. 33 provides that the "court on motion of a defendant may grant a new trial to that defendant if required in the interest of justice," that juror bias need not be established with unmistakable clarity, citing United States v. Salamone, 800 F.2d 1216, 1226 (3d Cir.1986), and that "under all of the peculiar facts and circumstances, we hold that the interests of justice will best be served by granting the motion of the defendant for a new trial." This appeal followed.
 
 
 24
 There is, of course, no question but that we approach this appeal with deference to the district court, as rulings on motions for new trials are committed to its sound discretion and thus may be reversed only for abuse of that discretion. See United States v. Adams, 759 F.2d 1099, 1108 (3d Cir.), cert. denied, 474 U.S. 906, 106 S.Ct. 275, 88 L.Ed.2d 236, 474 U.S. 971, 106 S.Ct. 336, 88 L.Ed.2d 321 (1985). Even so, we find no basis to support the order for a new trial. At the conclusion of the hearing on January 13, 1989, the court made very specific findings that it believed Farabaugh and not Gneuhs, hardly a surprising conclusion in view of Gneuhs's dealings with Koval both before and after Gneuhs's jury service. Furthermore, Gneuhs seems to have been interested in the case as he expressed concern to Stevens about Tozzi getting a "fair shake," and, according to Stevens, was concerned about her. We also note that in his testimony at the hearing he referred to Tozzi by her first name, perhaps reflecting a certain familiarity with her. Thus, it is not surprising that the district court did not in its memorandum opinion retreat from its findings at the conclusion of the evidence that Gneuhs was not believable.[4]
 
 
 25
 The court in its memorandum did not change its favorable assessment of Farabaugh's credibility, though it said that the impact of the visit to him by the Internal Revenue Service could not be discounted.[5] Rather, it pointed out that at the close of the hearing on January 13, 1989, it found Farabaugh to be the more credible witness and it did not suggest in the memorandum that this finding had been wrong. Of course, inasmuch as the court did not change its assessment of Gneuhs's testimony, the impact of Clark's visit on Farabaugh was hardly significant, as there was no believable testimony that Farabaugh harbored any bias against Tozzi. Thus, though the allegations against Farabaugh disturbed the court, inasmuch as it accepted Farabaugh's testimony, it found that Farabaugh had not known Tozzi before the trial and had not made the statements attributed to him by Gneuhs.
 
 
 26
 Why then was a new trial granted? The district court said that "the allegations and evidence of possible juror bias are troubling." The problem with that statement is that allegations and evidence make no difference if they are not accepted. In short, no matter how strong an allegation, if it is rejected, as it was here, it is immaterial. The court also said that the denial of impropriety by Farabaugh must be tempered by the fact that he was, against the court's order, interviewed by Clark. The difficulty with this statement is manifest. The visit by Clark was significant only if it affected Farabaugh's testimony, but the court accepted that testimony and rejected that of Gneuhs.[6]
 
 
 27
 The court also said that the jury, which at first was unable to reach a verdict, took nearly two days to do so. The court noted that the jury at Tozzi's first trial could not reach a unanimous verdict. These circumstances, however, only demonstrated that the case was difficult.[7] Indeed, we do not think that it is particularly surprising that it took the jury almost two days to reach a verdict in a tax case in which there was about one week of testimony. In any event, once the factual predicate for the charge of bias was rejected, the fact that the case may have been close or difficult did not matter, as there was nothing in the record to impeach the integrity of the verdict and the court did not suggest that the evidence did not support the verdict.[8] Certainly, the length of the deliberations alone was no reason to grant a new trial.
 
 
 28
 The parties have briefed the question of whether a court to grant a new trial must find that a juror was actually biased or whether bias can be implied from the circumstances established. See, e.g., Smith v. Phillips, 455 U.S. 209, 215, 102 S.Ct. 940, 945, 71 L.Ed.2d 78 (1982); United States v. Salamone, 800 F.2d at 1225 n. 11; United States v. Ferri, 778 F.2d at 992-93; United States ex rel. De Vita v. McCorkle, 248 F.2d 1, 6 (3d Cir.), cert. denied, 355 U.S. 873, 78 S.Ct. 121, 2 L.Ed.2d 77 (1957); De La Rosa v. Texas, 743 F.2d 299, 305 (5th Cir.1984), cert. denied, 470 U.S. 1065, 105 S.Ct. 1781, 84 L.Ed.2d 840 (1985); United States v. Jones, 707 F.2d 1169, 1173-74 (10th Cir.), cert. denied, 464 U.S. 859, 104 S.Ct. 184, 78 L.Ed.2d 163 (1983); United States v. Vargas, 606 F.2d 341, 344-45 (1st Cir.1979). We, however, need not be concerned with that distinction because, even assuming that bias might in some circumstances be implied, though actual bias is not demonstrated, it could only be implied from facts. United States v. Jones, 707 F.2d at 1173. Here, however, there are no facts to support a claim of implied bias, as the district court accepted Farabaugh's testimony that prior to the trial he did not know Tozzi and he rejected Gneuhs's contrary testimony. Accordingly, as the district court had no reason to grant a new trial on the basis of juror prejudice and its other reasons for doing so were insufficient, the court abused its discretion in granting a new trial.
 
 
 29
 In view of the aforesaid, the order of May 31, 1989, granting Tozzi a new trial will be reversed, the verdict will be reinstated, and the matter will be remanded to the district court for further proceedings consistent with this opinion.
 
 
 
 [1]
 In her brief, Tozzi describes Skelton as being her husband but the government in its brief questions that assertion and thus his status is in doubt. The parties characterize Acme's business somewhat differently. The government refers to it as being a coin operated vending machine company and, as a matter of convenience, we will so refer to it rather than use Tozzi's characterization of its business as being coin operated amusement machines
 
 
 [2]
 No inference can possibly be drawn from the discussion regarding a polygraph
 
 
 [3]
 An issue was also raised as to the accuracy of Farabaugh's answer on voir dire regarding prior jury service. He apparently had previously been called for jury duty but had never sat on a case. We have not, however, described the evidence relating to it, as the district court did not rely on the issue of Farabaugh's prior jury service in ruling on the new trial motion and the matter was only mentioned in passing in the opinion
 
 
 [4]
 Tozzi had an opportunity to corroborate Gneuhs's testimony as Gneuhs suggested that there had been prior dealings between Farabaugh and Acme. Tozzi produced no evidence in support of this claim
 
 
 [5]
 This apparently reflected a slight modification of the court's approach for at the close of the hearing on January 13, 1989, when Tozzi raised the question of Clark's interview, the court observed that "I don't think that's of any great consequence."
 
 
 [6]
 Certainly a new trial could not be granted as a sanction for the violation of the court's directive regarding interviews of the jurors. Furthermore, the impact of the Clark visit on Farabaugh was not enhanced by the fact that the court had directed that it not take place
 
 
 [7]
 The first trial was clearly a complicated affair, as it took about one month and was a joint trial of Alan Frank and Tozzi
 
 
 [8]
 On March 13, 1989, Tozzi filed a report from a polygraph examiner which tended to support a conclusion that Gneuhs's testimony regarding what Farabaugh said was truthful. The government filed a motion to strike the report but it appears that no order was ever entered on its motion. The court, however, did not mention this report in its opinion and thus there is no indication that it relied on it in making its findings