UNITED STATES of America

v.

William R. JENKINS, Defendant.

No. Crim. 97–023.

United States District Court, M.D. Pennsylvania.

July 24, 1998.

Bruce Brandler, U.S. Attorney, Harrisburg, PA, for Plaintiff.

William R. Jenkins & Gero A. Bartolai, Federal Public Defender, Scranton, PA, for Defendant.

### MEMORANDUM and ORDER

NEALON, District Judge.

Defendant, William R. Jenkins, was indicted in an eleven count indictment[1] and, after a jury trial, was found guilty on all counts except Count Nine which accused him of possessing thirteen machine guns in violation of 18 U.S.C. § 922(o). While the jury was deliberating, it was discovered that, in Count Eight of the indictment charging defendant with possession of firearms by a convicted felon, 18 U.S.C. § 922(g)(1), an improper reference was made of the felony itself, viz., 2nd degree murder. The jury was allowed to continue with its deliberations and returned the verdict as hereinabove described. Immediately thereafter, the court conducted an individualized voir dire and, after concluding

that there was no prejudice to defendant because of the improper disclosure, the verdicts were received and entered. Defendant has filed posttrial motions for a judgment of acquittal on Count Four and for a new trial on the remaining counts. The motions have been fully briefed and are before the court for disposition. As explained hereafter, the motions will be denied.

I.

### MOTION FOR JUDGMENT OF ACQUITTAL

■ Defendant contends that the evidence at trial was insufficient as to Count Four to sustain a conviction under 18 U.S.C. 924(c)(1) which provides for additional penalties if the defendant "during and in relation to any crime of violence or drug trafficking crime, uses or carries a firearm." He concedes that, in certain circumstances, the exchange of a firearm for a controlled substance may constitute "use" of a firearm "during and in relation to a drug trafficking crime." *Smith v. United States*, 508 U.S. 223, 113 S.Ct. 2050, 124 L.Ed.2d 138 (1993), but maintains that, in this case, the evidence was insufficient to show that the firearm was an operative factor in relation to the offense. *Bailey v. United States*, 516 U.S. 137, 116 S.Ct. 501, 133 L.Ed.2d 472 (1995). However, interpreting the evidence in the light most favorable to the government, as we are required to do in deciding a motion for judgment of acquittal, *See, United States v. McNeill*, 887 F.2d 448 (3d Cir.1989), *cert. denied*, 493 U.S. 1087, 110 S.Ct. 1152, 107 L.Ed.2d 1055 (1990), leads to the conclusion that the machine guns were used to pay off a marijuana debt and to induce a co-conspirator, "G"[2], to make another marijuana shipment from Arizona to the

---

1. Count One charged conspiracy, generally, 18 U.S.C. § 371; Count Two—marijuana conspiracy, 21 U.S.C. § 846; Count Three—distribution of controlled substances, 21 U.S.C. § 841(a)(1); Count Four—using and carrying firearms in connection with drug trafficking, 18 U.S.C. § 924(c)(1); Count Five—interstate travel in aid of racketeering, 18 U.S.C. § 1952; Count Six—transportation of machine guns in interstate commerce, 18 U.S.C. § 922(a)(4); Count Seven—false statements in connection with the acquisition of firearms, 18 U.S.C. § 922(a)(6);

Count Eight—possession of firearms by a convicted felon, 18 U.S.C. § 922(g)(1); Count Nine—possession of machine guns, 18 U.S.C. § 922(o); Count Ten—unlawful transfer of machine guns, 18 U.S.C. § 922(o); Count Eleven—possession of a firearm without a serial number, 26 U.S.C. § 5861(1).

2. "G" was later identified in testimony as Greg or Glen Gordon.

defendant in Pennsylvania. It should be noted also that defendant was charged in Count Four, not only as a principal, but also as an aider and abettor.

David Sauve testified that he had participated in a drug conspiracy with defendant and "G" for a number of years and that marijuana was mailed by "G" to defendant on a bi-monthly basis.[3] Further, that Sauve received part of these shipments which he, in turn, sold to his customers. He stated that defendant, when he gave Sauve the machine guns in August, 1992, said "here, take these to 'G'." When asked what defendant told him as to why he was sending these weapons to "G", Sauve responded "(t)o pay off part of the bill he owed 'G', but as to, exactly, how much, I'm unaware." When he delivered the guns to "G", in Arizona, he was told by "G" to tell defendant "to expect a shipment." A shipment of marijuana was mailed from Tucson, Arizona[4], on October 5, 1992, to defendant's brother, Glenn Jenkins, P.O. Box No. 492, Canadensis, Pa., who testified that defendant had previously asked him to allow defendant to use his post office box to accept delivery of a marijuana shipment from "G", and that defendant promised to pay him $1,600.00 for using his box. Later, he received a call from defendant to pick up a package at his Post Office box and, when he did, he was promptly arrested by postal authorities. The package contained approximately nine (9) pounds of marijuana. Additionally, another of defendant's brothers, Jake Jenkins, testified that defendant told him, immediately after Sauve returned from Arizona, that he had paid off his debt to "G" with machine guns.

"A defendant challenging the sufficiency of the evidence bears a heavy burden." *United States v. Casper,* 956 F.2d 416, 421 (3d Cir. 1992). "Only when the record contains no evidence from which the jury could find guilt beyond a reasonable doubt, may the verdict be overturned." *McNeill,* 887 F.2d at 451. The trial court must uphold the jury's verdict unless no rational jury could have concluded beyond a reasonable doubt that the defendant committed the crime. *United States v. Ashfield,* 735 F.2d 101 (3d Cir.1984). The evidence presented here was more than sufficient to show that the delivery of these firearms was directly related to past, present, and future drug transactions. The motion is without merit.

II.

Count Eight of the Indictment, charged defendant with possession of firearms after having been convicted of a crime punishable by imprisonment for a term exceeding one year, to wit: "second degree murder." Prior to trial, it was stipulated that the reference to Murder in the Second Degree be redacted. *See, Old Chief v. United States,* 519 U.S. 172, 117 S.Ct. 644, 136 L.Ed.2d 574 (1997) 519 U.S. 172, 117 S.Ct. 644, 136 L.Ed.2d 574. Unfortunately, redaction did not occur and the Indictment went out with the jury when deliberations commenced.[5] After the jury had requested a clarification of the instruction on aiding and abetting, defense counsel inquired whether redaction of the Indictment

---

3. Sauve identified a previous photograph taken at an Arizona Prison in which he, defendant and "G" were shown together.

4. A postal official from Arizona testified that Gordon resided in Tucson, Arizona.

5. In response to defense counsel's request that the murder conviction be withheld from the jury, the following colloquy occurred:

THE COURT: Well, is it in the Indictment?
MR. BARTOLAI: It is, your honor.
THE COURT: Well, then, you ought to redact it in some manner.
MR. BRANDLER: I have no problem redacting it, once they get the indictment, for the time of deliberations.

Tr. Vol. I, P.8.
Later, prior to submission to the jury, government counsel made the following comment at side bar:
MR. BRANDLER: There are just two matters. First of all, I think the Court mentioned, earlier, that it might be giving a copy of the indictment to the jury, while they deliberate, and I just wanted to make sure the Court was aware that the felon in possession count mentions the murder conviction, and that would have to be redacted out or blacked out, before it was given to the Jury.
Tr. Vol. V, p. 114.
Apparently, the Courtroom Deputy thought counsel would do the redacting while counsel believed it would be done by the Courtroom Deputy.

had actually taken place. At the court's request, the Courtroom Deputy entered the jury room and retrieved the Indictment which revealed the failure to delete. The redaction was made and the Indictment was resubmitted to the jury. Shortly thereafter, the jury delivered the following note to the Court:

"Dear Judge Nealon:

We are aware of the omission that was made in Count Eight of the Indictment (the second degree murder conviction). We do, however, feel that this information will not cloud or sway our decision, several of which had been made before the time we were made aware of this.

Susan Lloyd."

Defense counsel immediately moved for a mistrial which was denied inasmuch as a defense challenge would be moot if the jury returned not guilty verdicts on each Count. After further deliberation, the jury returned its verdict of guilty on Counts One through Eight, not guilty on Count Nine, and guilty on Counts Ten and Eleven.

After reading the verdict, the court explained to the jury that an individual voir dire would have to be conducted because of the reference in the Indictment to the prior conviction of 2nd degree murder. At that time, all were directed not to discuss anything about the case in the jury room while awaiting their turns to appear in chambers and, after being questioned, each juror was instructed not to discuss their individual voir dire appearances with each other. During the voir dire, all jurors stated that verdicts of guilty had been reached on Counts Two and Three before they became aware of the prior conviction although there was uncertainty among some as to whether a unanimous verdict had been reached on Count One.

Juror Lloyd Waite, who kept the record for the jury of the votes on each Count, testified that the jury had reached unanimous verdicts of guilty on Counts One, Two, and Three before any of the jurors became aware of the reference to the 2nd degree murder conviction.[6] Tr. Vol. V, pp 184–188.

All jurors testified during the voir dire that they had discussed the murder conviction after its disclosure and decided, while in the jury room prior to reporting this knowledge to the court, that they could decide the remaining counts fairly and eliminate the 2nd degree murder conviction completely from their minds. During the individual voir dire, all repeated that the same verdict would have been reached on all Counts even if redaction had occurred prior to deliberations. The court was satisfied that their testimony was truthful. However, because there remained some uncertainty about Count One, the court asked the jury to return to the jury room, not to deliberate, but to clear up the question concerning the verdict on Count One, as follows:

THE COURT: Thank you, again, members of the jury, for your patience, and if you're not patient, I understand it. But let me tell you, the result of the individual voir dire would indicate that all of the jurors were satisfied that verdicts of guilty had been agreed on, as to Counts 2 and 3, before learning of the reference to the crime of second degree murder in Count 8. There was some uncertainty as to Count 1, without going into numbers, there were those who believed that a verdict had been reached on Count 1, and there were those who weren't certain that a verdict had been reached on Count 1.

And I'm hesitant to do this, but I'm going to ask you if you'd go back into the jury room and discuss among yourselves whether you believed that you did or did not reach a verdict on Count 1, before you learned of the reference to second degree murder in Count 8. And just knock on the door, when you've reached that conclusion, and we'll have you come out, again. All right, would you go back to the jury room, please. Vol. V., p. 232.

Subsequently, the jury returned and the Foreperson delivered the following report:

---

**6.** Apparently, while the jurors were awaiting the court's supplemental instruction on aiding and abetting, one of the jurors commenced reading the indictment and, upon discovering the 2nd degree murder reference, brought it to the attention of the other jurors.

MS. LLOYD: After discussion, we are all in agreement that we had made our decision on Count 1, 2 and 3, our final decision, before we caught the mistake or questionable portion of Count 8.

THE COURT: About the second degree murder conviction.

MS. LLOYD: Yes, Counts 1, 2 and 3 were decided upon. Vol. V., pp 232, 233.

The verdicts were thus entered and sentencing deferred pending a presentence investigation.

### III.

In his motion for a new trial, defendant advances two arguments, *viz.,* (1) the court erred by conducting a voir dire examination of the jury and, (2) the motion for a mistrial should have been granted upon discovering that the jurors were aware of the murder conviction.

■ Concerning the first argument, there is ample authority in this circuit supporting a trial court's resort to individualized voir dire when the issue of possible prejudice surfaces. *United States v. Clapps,* 732 F.2d 1148 (3d Cir.1984). In fact, our Circuit Court has been critical where the trial court did not conduct individualized voir dire to determine if any of the jurors did harbor some prejudice. "We conclude that the district erred by declining to engage in further inquiry—such as individualized voir dire—upon which it could have determined whether the jurors had maintained open minds." *United States v. Resko, et al.,* 3 F.3d 684, 691 (1993). Further, "(w)here there is a significant possibility that a juror or potential juror has been exposed to prejudicial extra-record information, we have expressed our preference, in general, for individual, *in camera* questioning of the possibly-tainted juror", *Government of Virgin Islands v. Dowling,* 814 F.2d 134, 137 (1987).

A problem, similar to the one here, developed in *Dowling,* where, during the trial, a newspaper reported that the defendant previously had been convicted of bank robbery, that he had been acquitted of murdering a store owner during an attempted armed robbery, and that his bail had been revoked following the acquittal. The *Dowling* court stated that a trial judge must develop a record sufficient to permit evaluation of the potential prejudice to the defendant and make a finding regarding the jurors' ability to perform their assigned task which took into account whatever information they had received. Failure to do this, the court concluded, constituted error. Thus, it should be obvious, that individualized voir dire was not only appropriate, but mandatory under the circumstances of this case.

■ The second argument challenges the denial of the motion for a mistrial made after the court concluded that the jury's verdict was an impartial one and not affected by knowledge of the 2nd degree murder conviction.

■ "In every case where the trial court learns that a member or members of the jury may have received extra-record information with a potential for substantial prejudice, the trial court must determine whether the members of the jury have been prejudiced." *Dowling,* at 139. It is for the trial court to determine whether a juror's claim of impartiality is to be believed. *Id.*

Initially, it should be noted that the jury was unanimous in informing the court that verdicts of guilty had been reached on Counts One, Two and Three before any of the jurors became aware of the reference to the conviction in Count Eight of the indictment. While there may have been some confusion as to the finality of the verdict on Count One, it concerned the recollections of some as to whether they had actually reached a verdict on that Count, and not to any disagreement concerning defendant's guilt or innocence on that Count.

The verdicts on the remaining counts were reached after the reference in Count Eight was made known to the jurors but after they had agreed unanimously that they could disregard that knowledge and decide those counts solely on the evidence. The court had the advantage of evaluating that representation while each juror was being questioned by the court and counsel. Their demeanor, candor, and knowledge of the issues were extremely impressive. In fact, prior to dis-

charging the jury, the court made the following spontaneous comments:

> "Members of the jury, I know it's almost 12:00 and you're exhausted. I do have to say one final word to you. I've been a Judge thirty-eight years, and, sometimes, I've had faith in the jury system and, sometimes, I have not. But, rarely, do we ever get to individually voir dire, that is, ask questions of the jurors about their deliberations. I must tell you, I was very, very impressed by your grasp of the issues and the manner in which you expressed yourselves.
>
> This was really an A plus jury, believe me when I say that, I'm not saying that to flatter you. I think everyone in that room had to be very impressed by the responses from this jury. So with that, members of the jury, you're, now, excused, with our thanks, after a long and hard week, and we really express our appreciation to you." Vol. V. p. 233.

Moreover, the possibility of prejudice was diluted by the evidence against defendant which was overwhelming. The government's case detailed his prior purchases of firearms; his converting them into machine guns; his fraudulently acquiring some in his brother's name; his numerous admissions concerning firearms and drug trafficking; his felony conviction which was a necessary ingredient in Count Eight; his long term conspiracy with "G" and Sauve, his most damaging witness; the implicating testimony of his two brothers; the interception of the marijuana at his brother's postal box and confiscation of an express mail parcel mailed from defendant containing $9,000 in cash; and the purchases of marijuana from defendant as described by witnesses Jones, Reese, and Arnsperger. Defense counsel's representation that, if he had known that the 2nd degree murder conviction would come to the attention of the jury, he would have conducted his case differently is not plausible. The defendant had an extensive criminal record that could have been used to impeach his credibility had he taken the stand. Furthermore, there is no specific showing as to how trial strategy could have been effectively altered by defense counsel in order to address the prior conviction.

When a significant question of juror prejudice arises, the trial court should conduct a hearing, in which all parties should be permitted to participate, and determine whether or not it was prejudicial. *Remmer v. United States,* 347 U.S. 227, 74 S.Ct. 450, 98 L.Ed. 654 (1954). The court may rely solely on the testimony of the juror in deciding the question of impartiality. *Smith v. Phillips,* 455 U.S. 209, 102 S.Ct. 940, 71 L.Ed.2d 78, (1982) 455 U.S. 209, 102 S.Ct. 940, 71 L.Ed.2d 78.

A new trial should not be granted on the ground of juror bias if, after a hearing, the court accepts the testimony of the juror that indicates she was not biased. *United States v. Skelton,* 893 F.2d 40 (3d Cir.1990), *cert. denied,* 498 U.S. 814, 111 S.Ct. 53, 112 L.Ed.2d 29.

After carefully considering the testimony given during the voir dire examination, the court is convinced that their expressions of impartiality and absence of prejudice were completely truthful. It is concluded, therefore, that knowledge of the prior conviction of the defendant for second degree murder did not influence or affect, in any way, the guilty verdicts rendered in this case.

### ORDER

Accordingly, this 24th day of July, 1998, the motion for judgment of acquittal on Count Four and the motion for a new trial on Counts One through Eight and Ten and Eleven, are denied.