**UNITED STATES of America,**

v.

**Joseph DEVERY and Joaquin Rivera, Defendants.**

**No. 93 Crim. 273 (LAP).**

United States District Court,
S.D. New York.

July 29, 1996.

Tai H. Park, Assistant United States Attorney, U.S. Attorney's Office, Southern District of New York, New York City, for U.S.

Paul T. Gentile, Gentile & Dickler, Camille Marie Abate, New York City, for Joseph Devery.

David L. Lewis, Lewis & Fiore, New York City, for Joaquin Rivera.

## OPINION and ORDER

PRESKA, District Judge:

After an eight-week trial in which they were found guilty of conspiring to violate federal money laundering laws, defendants Joseph Devery and Joaquin Rivera have moved, under Federal Rules of Criminal Procedure 29 and 33, for a judgment setting aside the verdict or for a new trial. For the reasons stated below, defendants' motions are denied.

## BACKGROUND

Defendants' trial began on September 21, 1995 and ended on November 30, 1995. After eight days of deliberation, the jury convicted both defendants on Count I of the Indictment, which charged them with conspiring to violate the money laundering laws in violation of 18 U.S.C. 371, but deadlocked on Counts II and III of the Indictment, which charged them with the substantive money laundering violations of 18 U.S.C. § 1956 and 18 U.S.C. § 1957. The parties are fluent with the facts of this case, which will not be set out in detail. Only the circumstances pertinent to each facet of the defendants' motions will be described below.

The unlawful proceeds at issue in this case were the revenue of an enormous heroin trafficking network operating out of the Bronx, New York for approximately eight years. At its peak, this operation generated cash revenues of over a million dollars a week. The kingpin of the enterprise was Robert Torres, who was arrested in March 1993 and pleaded guilty six months later. Torres then testified against Devery and Rivera as a cooperating witness. A jury found that Devery, a banker, and Rivera, a lawyer, had conspired to help Torres launder his abundant, tainted cash.

The Indictment accused Devery of using his position as a Vice President at Chase Manhattan Bank, working out of a branch in the Bronx, to help Torres launder his drug money by structuring large cash deposits into amounts less than $10,000 so as to avoid a federal law requiring the filing of Cash Transaction Reports, or "CTRs," for cash deposits of $10,000 or more. Rivera was accused in the Indictment of helping Torres launder his drug money through real estate purchases.

After his conviction, Devery moved to set aside the verdict or for a new trial, offering three grounds on which he was denied a fair trial. The first was that I had erroneously excluded four venirepersons from the jury for cause. The second was that I had erroneously precluded the scope of the cross-examination of one of the government's witnesses. Third, Devery argued that the jury, on the day it rendered its verdict, engaged in deliberation in the absence of one of the jurors. Rivera joined in the motion.

While the motion was pending, the government sent a letter to the Court and to defense counsel, dated March 12, 1996, revealing that it had just discovered that Robert Torres had committed perjury during his testimony. Defendants requested, and received, the right to add this development to their grounds to set aside the verdict or for a new trial, and each has submitted a motion asking for the same, on the basis of newly discovered evidence.

## DISCUSSION

### I. Voir Dire and For Cause Exclusions

Defendants first argue that they were denied their Sixth Amendment right to a fair trial when four venirepersons were improperly excluded for cause.

Within the context of the Sixth Amendment, the importance of voir dire to protecting the accused's right to a fair trial is well recognized. The Supreme Court has noted that

[v]oir dire plays a critical function in assuring the criminal defendant that his Sixth Amendment right to an impartial jury will be honored. Without an adequate voir dire the trial judge's responsibility to remove prospective jurors who will not be able impartially to follow the court's instructions and evaluate the evidence cannot be fulfilled.

*Rosales–Lopez v. United States,* 451 U.S. 182, 188, 101 S.Ct. 1629, 1634, 68 L.Ed.2d 22 (1981). A second function of voir dire is to preserve counsels' right to exercise peremptory challenges. *See Mu'Min v. Virginia,* 500 U.S. 415, 431, 111 S.Ct. 1899, 1908, 114 L.Ed.2d 493 (1991) ("Voir dire examination serves the dual purposes of enabling the court to select an impartial jury and assisting counsel in exercising peremptory challenges."). Under Federal Rule of Criminal Procedure 24(a) and the traditional practice of this Court, conduct of voir dire is properly entrusted to the presiding trial judge.

█ Although "subject to the essential demands of fairness," *Aldridge v. United States,* 283 U.S. 308, 310, 51 S.Ct. 470, 471, 75 L.Ed. 1054 (1931), a trial judge has "broad discretion" in conducting voir dire. *Rosales–Lopez,* 451 U.S. at 189, 101 S.Ct. at 1634–35; *Ham v. South Carolina,* 409 U.S. 524, 528, 93 S.Ct. 848, 850–51, 35 L.Ed.2d 46 (1973); *Dennis v. United States,* 339 U.S. 162, 168, 70 S.Ct. 519, 521–22, 94 L.Ed. 734 (1950); *Aldridge,* 283 U.S. at 310, 51 S.Ct. at 471. In *Rosales–Lopez,* the Supreme Court explained the purpose behind the trial judge's latitude in this area.

Despite its importance, the adequacy of voir dire is not easily subject to appellate review. The trial judge's function at this point in the trial is not unlike that of the jurors later on in the trial. Both must reach conclusions as to impartiality and credibility by relying on their own evaluations of demeanor evidence and of responses to questions.... In neither instance can an appellate court easily second-guess the conclusions of the decision-maker who heard and observed the witnesses.

Because the obligation to impanel an impartial jury lies in the first instance with the trial judge, and because he must rely largely on his immediate perceptions, federal judges have been accorded ample discretion in determining how best to conduct voir dire.

*Rosales–Lopez,* 451 U.S. at 188–89, 101 S.Ct. at 1634; *see Wainwright v. Witt,* 469 U.S. 412, 428, 105 S.Ct. 844, 854, 83 L.Ed.2d 841 (1985) (the determination of whether a venireperson is biased is "based upon determinations of demeanor and credibility that are peculiarly within a trial judge's province"); *Mu'Min,* 500 U.S. at 431, 111 S.Ct. at 1908; *Dennis,* 339 U.S. at 168, 70 S.Ct. at 521–22; *United States v. Gonzalez–Balderas,* 11 F.3d 1218, 1222 (5th Cir.1994) ("We have only the cold record before us; the trial court had the opportunity to observe the voice and demeanor of the person in determining what he really was saying and in assessing his credibility."), *cert. denied,* —— U.S. ——, 114 S.Ct. 2138, 128 L.Ed.2d 867 (1994). This broad discretion has long been recognized by the Court of Appeals for the Second Circuit. *See, e.g., United States v. Ploof,* 464 F.2d 116, 118 (2d Cir.) (citing cases), *cert. denied sub nom., Godin v. United States,* 409 U.S. 952, 93 S.Ct. 298, 34 L.Ed.2d 224 (1972).

The four for cause exclusions challenged by defendants occurred under the circumstances described below—keeping in mind that voir dire was being conducted to choose a jury for a criminal trial involving the laundering of money gained from the unlawful sale of drugs by, among other means, avoiding the filing of CTRs.

## A. Jurors Who Avoided Filing CTRs

In the morning of the first day of jury selection, two venirepersons indicated, at separate sidebar conferences outside the hearing of the jury pool, that they themselves took part in activity that involved the structuring of cash transactions of over $10,000 in such a way as to avoid CTR filing requirements. The first, Juror no. 7, worked in the payroll department for a cemetery which employed about 60 men who were each paid four or five hundred dollars a week in cash. Juror no. 7 went to the bank before payday and wrote out a check for some amount over $10,000 and the bank in return gave her cash. "Some years ago," she relat-

ed at sidebar, the rules changed and for "any transaction over $10,000 [the bank] wanted some sort of report made." (Transcript ("Tr.") 70). She was informed of the new rule by someone at the bank. For a period of two to three weeks, however, she recalled that the reporting requirement was avoided by writing out two checks for the bank in return for two cash sums under $10,000 each. "But rather than make the report, we were withdrawing funds for 10,000. So instead of—over 10,000. So instead of making two checks out—making one check, we made two to keep it under 10,000 so that we did not have to file a report." (*Id.*). After two or three weeks, the cemetery started paying its employees in checks rather than cash, obviating the weekly cash transactions ·with the bank and the CTR reporting requirement.

Over the objections of defense counsel, who argued that her answers did not manifest a willful violation of the law and that she had not been asked whether she felt she could not be impartial, Juror no. 7 was excused for cause on the government's motion. Before excusing the juror, the Court, still at sidebar, stated, "I don't see that she had to admit that she violated the law for it to rise to cause on this. What she may well think is that in following instructions on the law she may be forced to admit to herself that something she did violated the law. Maybe or maybe not. But I just can't imagine she could be fair." (*Id.* at 74).

Juror no. 27 was the general partner of a real estate venture which raised money from investors and bought and sold properties. Occasionally, investors would give him over $10,000 in cash, which he would deposit in a bank. After having been told by the bank at some point, which he placed around 1988,[1] that there was a new reporting requirement for cash deposits over $10,000, Juror no. 27 recalled breaking down a $12,000 or $13,000 cash deposit into two smaller amounts, each under $10,000. (*Id.* at 83–84). After similar objections from defense counsel, particularly over the mens rea element of money struc-

turing, Juror no. 27 was also excused for cause. Before he was excused, still at sidebar and outside the jury pool's hearing, the Court noted that "[m]y concern is, just as with [Juror no. 7], their activities are so close that they will feel threatened personally if they feel they must convict." (*Id.* at 90). A question was then asked, at the suggestion of defense counsel, to elicit whether this juror's past experience would impair his ability to be impartial.

> THE COURT: [Juror no. 27], as part of the instructions in this case, the instructions on the law, if I were to instruct you that breaking down a deposit of over $10,000 into two or more deposits of less than $10,000 in order to willfully evade the filing of a CTR, if I were to instruct you that that was illegal, *would that affect your ability to be fair and impartial in this case?*
>
> JUROR NO. 27: *I would think so.*
>
> THE COURT: *How, sir?*
>
> JUROR NO. 27: *Because I did it. I did it and you are telling me that I did something illegal, so I feel like you are accusing me of a criminal act.*

(*Id.* at 91) (emphasis added).

Defendants argue that Jurors no. 7 and 27 were improperly excluded for cause. Their argument rests heavily on the Court of Appeals for the Third Circuit's reasoning in *United States v. Salamone*, 800 F.2d 1216 (3d Cir.1986), *cert. denied*, 493 U.S. 895, 110 S.Ct. 246, 107 L.Ed.2d 196 (1989). The distinctions between *Salamone* and the present case are salient.

■ *Salamone* had been convicted of various firearms offenses. On appeal, his conviction was overturned because the trial judge was found to have "abused his discretion in conducting the voir dire proceedings." *Salamone*, 800 F.2d at 1220. The abuse consisted of the trial judge's perfunctory disqualification of several venirepersons solely because of their membership in the National Rifle Association.[2] No inquiry was made into

---

1. The reporting laws giving rise to the charges here were enacted in 1986. See 31 U.S.C. § 5324.

2. The opinion on appeal indicates that at least six jurors were excluded for cause on this basis.

their ability to serve impartially despite this affiliation. On appeal, Salamone objected to "the presumed bias of potential jurors which occasioned the arbitrary exclusion of an entire class of otherwise qualified jurors from his panel." *Id.* at 1224. The Court reasoned as follows.

> To allow trial judges and prosecutors to determine juror eligibility based solely on their perceptions of the external associations of a juror threatens the heretofore guarded right of an accused to a fair trial by an impartial jury as well as the integrity of the judicial process as a whole. Taken to its illogical conclusion, the government's position would sanction, *inter alia,* the summary exclusion for cause of NAACP members from cases seeking the enforcement of civil rights statutes, Moral Majority activists from pornography cases, Catholics from cases involving abortion clinic protests, members of NOW from sex discrimination cases, and subscribers to Consumer Reports from cases involving products liability claims.

*Id.* at 1225 (footnote omitted).

Underlying this reasoning was the fundamental principle that challenges for cause should be based not on "wholesale exclusions of a particular group," *id.* at 1227, but rather on an individual juror's ability to serve impartially and "in accordance with his instructions and his oath," *id.* at 1226 (citing *Thiel v. Southern Pac. Co.,* 328 U.S. 217, 220, 66 S.Ct. 984, 986, 90 L.Ed. 1181 (1946) ("Jury competence is an individual rather than a group or class matter.")). Individualized determinations, in turn, require "inquiries relevant to the discovery of actual bias." *Id.* Without a factual predicate underlying for cause exclusions, the voir dire is "inadequate to preserve and protect the rights of the accused." *Id.* The Court went so far as to invoke language from the Supreme Court in *Thiel,* positing that unsupported blanket exclusions for cause threaten to "open the door to class distinctions and discriminations which are abhorrent to the democratic ideals of trial by jury." *Id.* (quoting *Thiel,* 328 U.S. at 220, 66 S.Ct. at 986).

*Salamone* reaffirms unquestionably fundamental and worthy principles that are not at stake in the present case. First, there is no identifiable group here, even if two persons could be said to constitute a "group." Second, I did not, with Juror no. 7 or Juror no. 27, "determine juror eligibility based solely on [my] perceptions of the external associations of a juror." *Id.* at 1225. Third, the improperly excluded jurors in *Salamone* were excused because they belonged to a group, and because of that affiliation they were presumed to have opinions or beliefs that would prevent them from impartially weighing the evidence. In the present case, the excluded jurors actually engaged in the kind of activity for which one of the defendants was on trial. As stated above, when Juror no. 27 was asked if an instruction that willfully structuring a deposit to avoid filing a CTR was illegal would affect his ability to be fair and impartial he answered: "I would think so." (Tr. 91). When asked why, he answered: "Because I did it. I did it and you are telling me that I did something illegal, so I feel like you are accusing me of a criminal act." (*Id.*). This was not a perceived or presumed conflict, but an actual conflict that clearly impaired his ability to sit fairly as a juror, that clearly impaired his ability to weigh the evidence "in accordance with his instructions and his oath." *Salamone,* 800 F.2d at 1226. The NRA members in *Salamone* were not excluded because they admitted to the unlawful possession of firearms, the same act the defendant was accused of. They were excluded for the far more tenuous presumption that NRA membership alone prevented them from fairly weighing the evidence in a case involving firearms possession.

■ In sum, the two fears protected against in *Salamone* do not threaten here. First, there is no danger that the "wholesale" exclusion for cause of certain classes of persons will usher racial, sexual, social, economic or other invidious discrimination into our courtrooms and efface the Sixth Amendment's guarantee of a fair trial. Second, there is no danger that the exclusion of Jurors no. 7 and 27 deprived defendants of a fair trial. I find now, as I did then, that these jurors' bias was evident in the acts to which they admitted, and which too closely

resembled acts at the core of this trial. Juror no. 7 expressly acknowledged as much. For Juror no. 27, defendants might argue, bias was neither clearly expressed nor inevitable. Assuming this to be so, the mental gymnastics required for her to separate her own experience with CTRs from the extensive testimony about CTRs brought out at trial would have been too precarious and too strenuous to have been expected of any juror. I do not agree that, as a matter of law, an exclusion for cause is improper if the excused juror was not explicitly asked if he or she could impartially weigh the evidence as it was presented. In a case such as this, such an inquiry would have been redundant. Furthermore, even if the impartiality question is asked directly and answered affirmatively, a trial court need not accept on its face a prospective juror's pledge. Voir dire would be sterilized by such a restriction, and its function in securing a fair trial compromised. As former Chief Justice John Marshall has written, a prospective juror "may declare that he feels no prejudice in a case; and yet the law cautiously incapacitates him from serving on the jury; because it suspects prejudice; because in general, persons in a similar situation would feel prejudice." *United States v. Burr*, 25 Fed.Cas. 49, 50 (1807). The unsuitability of Jurors no. 7 and 27 was manifest in their actions, their demeanor, and their voir dire answers, and I was well within my discretion to excuse them for cause.[3]

Far more applicable than *Salamone* is *United States v. Ploof, supra.* Ploof was charged and convicted of, among other things, receiving and concealing a stolen motor vehicle. On appeal he challenged, *inter alia,* the refusal of the trial judge, The Honorable Thomas F. Murphy, late of this Court,

to exclude for cause a venireperson who indicated she "might" have difficulty being impartial because she had a friend who had been hit by a stolen car. The Court on review upheld Judge Murphy's determination. Noting that the juror "tried to extend the range for disqualification," the Court "appreciate[d] that the trial judge was getting a little sick of jurors trying to escape service." *Ploof,* 464 F.2d at 118. Importantly for our purposes, the Court contrasted this determination with Judge Murphy's determinations on who *should* be excused for cause.

> Earlier the court had excused for cause, on its own motion, four veniremen who related recent experiences they or immediate members of their families had had involving stolen or vandalized cars which they believed would bias them.

*Id.* Here, as in *Ploof,* the excluded jurors had engaged in conduct so proximate to the unlawful conduct defendant Devery was accused of that their experience necessarily—and, in one of the two instances, admittedly—impacted their ability to weigh impartially the evidence presented. In this case, there was the additional obstacle to impartiality that, after they were instructed on the law, these jurors may well have felt that, in weighing on the defendant's guilt or innocence, they were confronting the legality of their own past acts as well. As I noted during voir dire, "[m]y concern is . . . their activities are so close that they will feel threatened personally if they feel they must convict." (Tr. 90).[4]

*Ploof* also stressed the deference owed to a trial judge's management of voir dire when it stated that,

---

3. After finding an abuse of discretion in the conduct of the *Salamone* voir dire, the Court considered whether the defendant was entitled to any relief. *See Salamone,* 800 F.2d at 1227. The verdict was overturned when the abuse of discretion was found to be more than harmless error. However, the Court stated "[a]t the outset, we note that were we faced with the inadequate questioning of a single excluded juror we might apply a different standard for determining the prejudicial effect of the erroneous exclusion. However, where such 'manifest abuse of discretion' results in the wholesale exclusion of a particular group, we do not deem it necessary for the defendant to affirmatively demonstrate the existence of actual prejudice in the resulting jury panel. Under such circumstances, prejudice

may be presumed." *Id.* For the reasons discussed in this opinion, even were I to find that Jurors no. 7 and 27 were erroneously excluded, prejudice could not be presumed. *See United States v. Calabrese,* 942 F.2d 218, 227 (3d Cir. 1991) ("By its terms, the [Jury Selection and Service] Act only provides a remedy for *substantial* failures to comply with its provisions.") (citations omitted) (original emphasis).

4. Similarly, in *Gonzalez-Balderas, supra,* a narcotics distribution case, the Fifth Circuit upheld the trial court's exclusion for cause of a potential juror with a prior conviction for marijuana possession. The juror expressed doubts about his impartiality, but also said he thought he could be

[i]n the last analysis, the judge was in the best position to evaluate the juror's demeanor and to determine, by the juror's answers to the judge's questions, whether he could fairly and impartially hear the case and return a verdict based solely on the evidence presented in court.

*Ploof,* 464 F.2d at 118. The Court further noted that,

[t]here are few aspects of a jury trial where we would be less inclined to disturb a trial judge's exercise of discretion, absent a clear abuse, than in ruling on challenges for cause in the empaneling of a jury. Indeed, the entire voir dire procedure ... is one best left to the sound discretion of the judge.

*Id.* at 118–19 n. 4.

### B. Drug Dealer Witness Credibility

On the afternoon of the first day of jury selection, two subsequent for cause exclusions involved venirepersons who indicated they could not fairly and impartially consider the testimony of a drug dealer. In response to a question posed to the jury pool "relating to witnesses who may testify that they were drug dealers or that they committed other crimes," (Tr. 100), Juror no. 38 offered, at sidebar, that "I have a second cousin who was murdered by a drug dealer, and I don't know if I could render—if I could stay even on something like that," (*id.*). Juror no. 38 was then instructed by the Court that

[w]hat we seek to avoid is to have anything that you learned or any attitude that you have from outside the courtroom affect your judgment as to what you hear here.... What I guess we're trying to get at here is whether the nature of this testimony or the fact that it comes from someone who has admitted to committing one or more specific crimes would cause you, for reasons unrelated to the evidence, not to be fair and impartial.

(*Id.* at 110–11). In response Juror no. 38 said

[l]ike I said, if I knew somebody was involved in the drug trade, even if there wasn't evidence that this person had something to benefit from being there, I would have in-bred doubt in my mind about that person to begin with, just because of my experience in the past with such individuals.

(*Id.* at 111).

The government, out of hearing of the juror, stated that the juror's responses indicated he was "unfairly biased in the sense he cannot overcome his emotion." (*Id.* at 115). Defense counsel disagreed, arguing that the Court's questions were prejudicial to the defendants because they implied that jurors should not rely on their life experiences in questioning a witness's credibility. The Court, after hearing all sides, stated that

what I hear the juror saying is more than he merely thinks less of the person because he may have been a drug dealer and that he would simply take that into account, but rather that he cannot believe any of them merely for the reason that they are drug dealers, that there would be no circumstance under which he could believe them. For that reason he is going to be stricken.

(*Id.* at 115–16). At the request of defense counsel, Juror no. 38 was asked if he could "base any view or decision as to that witness's credibility only on what you heard in the courtroom." (*Id.* at 117). He responded: "I don't think I would be able to trust what I hear in the courtroom from that person." (*Id.* at 117–18). Thereafter, Juror no. 38 was excused for cause.

Again at sidebar, a second juror, also speaking to the credibility of drug dealers as witnesses, said that "[i]f they were witnesses or something like that, I think they're the

---

fair. Nevertheless, exclusion for cause was not an abuse of the trial judge's discretion. The Court wrote,

Green's prior conviction of a narcotics offense, albeit comparatively minor, posed substantial potential for bias in the trial of an accused narcotics trafficker. Indeed, Green admitted to such doubts about his impartiality. *The combination of objective grounds for bias and subjective doubts of impartiality* entitled the trial court to discount Green's conditional affirmation that he could be fair.

worst people on earth and I wouldn't believe them no matter what they said." (Tr. 123). This juror had had a friend killed two years earlier by a drug addict. When told by the Court that he was entitled to take into account any evidence he heard at trial—including evidence that the witness dealt drugs—in deciding if the witness was credible, and asked if he could "make a fair judgment as to that witness's credibility," (*id.*), this juror answered: "I don't think I would be able to do that. I don't think they have any credibility," (*id.*). When again asked if the circumstances of his friend's death "would affect your ability to make a fair judgment of the credibility of a witness who testifies he used to be a drug dealer," (*id.* at 124), the juror responded: "[l]ike I said before, I don't think they have credibility," (*id.*). When asked if he would weigh the evidence in determining the witness's credibility, the juror responded that "[i]f the witness was a drug dealer, no; I think whatever they say was probably a lie." (*Id.*). This venireperson was also excused.

 Defendants argue that the questions posed to these two jurors "prescreened" the jury pool, Devery Mem. In Support at 19, and prejudicially implied that it was "somehow unfair to disbelieve a drug dealer," *id.* at 17. A review of the record only reinforces my belief that these two venirepersons were properly excluded for cause. Neither exhibited the ability to impartially and without bias follow the jury charge and weigh the evidence as it would have been presented to them at trial. On the contrary, their statements during voir dire revealed powerful predispositions to disregard the testimony of an admitted drug dealer solely on account of the witness's prior unlawful acts. These predispositions were simply too prejudicial to the government's case. Rather than exhibit a willingness to weigh the evidence, including evidence that the witness was a drug dealer, before deciding what credence, if any, to lend to such testimony, both venirepersons, whose lives had been deeply and

permanently scarred by the drug trade, indicated that they did not believe that a witness whose background was so tainted was capable of telling the truth or worthy of belief. These jurors were not excused because they had "experiences" with drug dealers, Deft. Mem. of Law in Support at 14, or because they "would have difficulty believing what a drug dealer had to say," *id.* at 16, but because they had foreclosed the possibility of deciding, using all of the tools and common sense they acquired in their lifetimes, the credibility of certain government witnesses solely on the evidence that was put before them at trial.[5] As I determined then, I find now that neither was willing or able to perform without bias his role as arbiter of the facts, and it therefore was well within my discretion to exclude these candidates from the pool of potential jurors for this case. See 28 U.S.C. § 1866(c)(3) (a qualified juror may be "excluded by the court on the ground that such person may be unable to render impartial jury service"). If defendants are dissatisfied with the phrasing of the questions used to reach that determination, I find that the questions posed were appropriate and effective, and also well within my discretion to formulate. *See Rosales–Lopez,* 451 U.S. at 189, 101 S.Ct. at 1634 ("[T]he questions to the prospective jurors were put by the court, and the court had a broad discretion as to the questions to be asked.") (quoting *Aldridge,* 283 U.S. at 310, 51 S.Ct. at 471); *accord Salamone,* 800 F.2d at 1224 (trial judge's broad discretion to conduct voir dire "extends to the determination of what questions should be asked of potential jurors") (citations omitted); *United States v. Barber,* 80 F.3d 964, 967 (4th Cir.1996).

I pause here to note a third juror in this sequence of side bar interviews, who also expressed reservations about his ability to impartially weigh a drug dealer's testimony, but who was not excluded for cause. This venireperson doubted his own impartiality and confessed to "strong feelings about the

---

*Gonzalez–Balderas,* 11 F.3d at 1222 (footnote omitted) (emphasis added).

**5.** On witness credibility, the jury was instructed at the end of the trial that

what you must do in deciding credibility is to size a person up in light of his or her demeanor, the explanations given, and all the other

evidence in the case, just as you would in any important matter where you were trying to decide if a person was truthful, accurate, straightforward in his or her recollection. In deciding issues of credibility, remember, you should use your own common sense, your good judgment, and your own experience. (Tr. 3591).

subject," engendered by the death of a cousin from an overdose of heroin. (Tr. 132). He said, "I hate drug dealers and I can't trust what they say." (*Id.*). Unlike the two interviews described above, however, this inquiry indicated that the juror had not predetermined the question of credibility. When asked if he would be able take into account other factors presented at trial, besides his cousin's death, when weighing the witness's testimony, he answered, "I would like to think that I could, but I'm sure that it's still going to have an effect [on] how I perceive what he says." (*Id.* at 140).

### C. Implied Bias

█ For the reasons stated above, I find that each of the above for cause exclusions was proper, that voir dire revealed that each of the four prospective jurors was impaired by actual bias and could not impartially follow instructions and evaluate the evidence. In the alternative, even if actual bias was not expressly elicited, I find that each of the four were similarly impaired by implied bias. *See McDonough Power Equipment, Inc. v. Greenwood,* 464 U.S. 548, 558, 104 S.Ct. 845, 851, 78 L.Ed.2d 663 (1984) ("The bias of a prospective juror may be actual or implied; that is, it may be bias in fact or bias conclusively presumed as [a] matter of law.") (Brennan, J., concurring) (quoting *United States v. Wood,* 299 U.S. 123, 133, 57 S.Ct. 177, 179, 81 L.Ed. 78 (1936)); *Murphy v. Florida,* 421 U.S. 794, 800–01, 95 S.Ct. 2031, 2036–37, 44 L.Ed.2d 589 (1975) (discussing *Irvin v. Dowd,* 366 U.S. 717, 722, 81 S.Ct. 1639, 1642, 6 L.Ed.2d 751 (1961)); *Smith v. Phillips,* 455 U.S. 209, 222, 102 S.Ct. 940, 948, 71 L.Ed.2d 78 (1982) ("there are extreme situations which would justify a finding of implied bias") (O'Connor, J., concurring). Two of the excluded jurors had been indirectly victimized by drug dealing, an activity at the core of this case; the other two were themselves involved in activity like that charged in the Indictment. *See Hunley v. Godinez,* 975 F.2d 316, 319 (7th Cir.1992) ("[C]ourts have presumed bias in cases where the prospective juror has been the victim of a crime or has experienced a situation similar to the one at issue in the trial.").

Implied bias for cause exclusions have a limited but broadly recognized application. *See Hunley,* 975 F.2d at 319 (reviewing implied bias cases and presuming bias when jurors were burglarized during deliberations in burglary/murder case); *Burton v. Johnson,* 948 F.2d 1150, 1159 (10th Cir.1991) (presuming bias of prospective juror who was victim of domestic violence in case in which battered wife syndrome was a defense); *Person v. Miller,* 854 F.2d 656, 664 (4th Cir. 1988) ("[T]he doctrine of implied bias is limited in application to those extreme situations where the relationship between a prospective juror and some aspect of the litigations is such that it is highly unlikely that the average person could remain impartial in his deliberations under the circumstances."); *cert. denied,* 489 U.S. 1011, 109 S.Ct. 1119, 103 L.Ed.2d 182 (1989); *United States v. Eubanks,* 591 F.2d 513, 517 (9th Cir.1979) (prospective juror whose sons were incarcerated for heroin-related crimes presumed impartial in heroin conspiracy trial); *Government of the Virgin Islands v. Felix,* 569 F.2d 1274, 1277 n. 5 (3d Cir.1978) ("Challenges for cause are subject to approval by the court and must be based on a finding of actual or implied bias."); *United States v. Allsup,* 566 F.2d 68, 71–71 (9th Cir.1977) (implied bias justifies excuse for cause when the "potential for substantial emotional involvement, adversely affecting impartiality" is evident); *United States v. Haynes,* 398 F.2d 980, 983 (2d Cir.1968) (common law grounds for for cause challenge for implied bias have "retained their vitality"), *cert. denied,* 393 U.S. 1120, 89 S.Ct. 996, 22 L.Ed.2d 124 (1969); *Jackson v. United States,* 395 F.2d 615, 617–18 (D.C.Cir.1968) (prospective juror who participated in a 'love triangle' similar to one at issue at trial presumed impartial); *United States ex rel. De Vita v. McCorkle,* 248 F.2d 1, 7–8 (3d Cir.) (implied bias for cause exclusion justified when juror was victim of same type of crime being tried), *cert. denied,* 355 U.S. 873, 78 S.Ct. 121, 2 L.Ed.2d 77 (1957).

A review of the record confirms my determinations at the time that the inquiries made of each juror revealed a sufficient factual basis to find that they could be presumed impartial. *See United States v. Skelton,* 893 F.2d 40, 46 (3d Cir.) ("even assuming bias might in some circumstances be implied,

though actual bias is not demonstrated, it must be implied from facts"), *cert. denied sub nom., Tozzi v. United States,* 498 U.S. 814, 111 S.Ct. 53, 112 L.Ed.2d 29 (1990).

### D. The Empaneled Jury

■ Defendants speculate that questioning prospective jurors on their ability to weigh impartially a drug dealer's testimony was "in effect, a prescreening on the issue of credibility," Devery Mem. in Support at 16, which somehow "infected the rest of the jury," *id.* at 17. The four for cause exclusions are said to have had the effect of "santiz[ing] the jury for the government." *Id.* at 19. There is not one shred of evidence to support this theory. To begin with, the only question on the subject of a drug dealer's credibility directed to the entire jury pool was:

> [d]uring the course of the trial, you may hear witnesses who will testify that they were drug dealers or that they committed other crimes. Other than you've already told me, is there any juror who feels that the government's use of such witnesses would make it difficult for you to render a fair and impartial verdict in this case?

(Tr. 103). I cannot conceive how this question, which defense counsel knew would be asked in some form, could have contaminated the jury pool and led to a sitting jury that was "clearly imbalanced" in the government's favor. Devery Mem. in Reply at 6. The follow-up inquiries of the few prospective jurors who indicated they had some issues on this question were done at sidebar, out of hearing of the other venirepersons. The excused jurors departed from the courtroom immediately, without conferring with any remaining members of the jury pool. Defendants' assertions on this point seem little more than a transparent attempt to satisfy *Salamone's* insistence on substantial harm. See *supra* note 2; *see also Gonzalez–Balderas,* 11 F.3d at 1222 ("[Defendant] does not contest the impartiality of the panel that actually judged his case. This is fatal to his objection."). It is well-established in the Second Circuit that "in order for a trial judge's determination of a juror's impartiality to be set aside, there must be shown 'manifest' prejudice." *United States v. Brown,* 644 F.2d 101, 104 (2d Cir.) (citation

omitted), *cert. denied,* 454 U.S. 881, 102 S.Ct. 369, 70 L.Ed.2d 195 (1981); *see United States v. Jones,* 900 F.2d 512, 521 (2d Cir.) ("[c]onsidering the extensive inquiry into possible bias on voir dire and the complete absence of any evidence that the verdict was tainted" in finding no abuse of discretion in conduct of voir dire), *cert. denied,* 498 U.S. 846, 111 S.Ct. 131, 112 L.Ed.2d 99 (1990); *United States v. Gonzalez,* 483 F.2d 223, 226 (2d Cir.1973) (finding that, although defendant argued on appeal that jury pool was biased during voir dire, "[t]here is nothing in the record to suggest that the jurors ultimately selected failed to meet the jury standards and were unable to reach a fair and unbiased verdict").

■ Secondly, I strongly believe that defendants had the benefit of an unquestionably fair and impartial jury. The jurors were carefully selected, with substantial input from counsel, after four days of voir dire. I thought throughout the trial and continue to think today that the jury which heard this case was the most attentive, conscientious, and careful jury to have sat in my courtroom. I am convinced that the empaneled jurors were at all times faithful to their oath and the rule of law as they were instructed and that they reached their decision by impartially weighing the evidence as it was presented to them. Throughout the entire eight-week trial, they listened intently as both sides presented their cases. I have not the slightest inclination that any juror who deliberated on the defendants' guilt or innocence was in any way unfairly tainted, or that the jury as a whole comported itself with anything but respect for the rights of the accused and the importance of a fair trial.

### II. Cross–Examination of Damiani

■ Rule 608(b) of the Federal Rules of Evidence provides:

> [s]pecific instances of the conduct of a witness, for the purpose of attacking or supporting the witness' credibility, other than the conviction of crime as provided in rule 609, may not be proved by extrinsic evidence. They may, however, in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on

cross-examination of the witness (1) concerning the witness' character for truthfulness or untruthfulness....

Fed.R.Evid. 608(b). As indicated in the Advisory Committee notes and developed in case law, Rule 608(b)'s discretionary analysis is circumscribed by the standard for the admissibility of evidence articulated in Rule 403, which allows a trial judge to exclude relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by consideration of undue delay, waste of time, or needless presentation of cumulative evidence." Fed. R.Evid. 403; see Saltzburg, *et al.*, *2 Fed.R.Evid.Manual*, p. 844 (6th ed. 1994).[6]

As a second basis for their post-trial motions, defendants argue that I improperly disallowed them from pursuing a proposed line of questioning during the cross-examination of government witness Anthony Damiani. In particular, I precluded defendants from asking Damiani about his alleged repeated rapes of his juvenile stepdaughter. This issue was discussed and the evidentiary ruling made at an *in camera* conference on September 21, 1995, after voir dire and just prior to the government's opening statement.

The government first argued, speaking to probative value, that Damiani was never convicted of the crime.[7] It also argued that this type of prior act, however heinous, did not bear on the witness's character for truthfulness and would unfairly inflame the jury's prejudice against him. The defendants countered that although not convicted, Damiani was found by a Bronx Family Court, in a proceeding regarding the stepdaughter, to have raped and abused her repeatedly. Defendants argued, as they do in this motion, that this horrible violation of a family trust evinced a "morally repulsive" character, Devery Mem. in Reply at 10, and made him "a person not worthy of belief." (Tr. 3 (Sept. 21, 1996)). To bolster his argument, defen-

dant Devery asserted that Damiani's testimony was critical to the outcome of the case, in that it would provide the only direct evidence that Devery knew about the unlawful source of Torres's money. Damiani did testify that he took part in a conversation in Devery's office, in Devery's presence, about Torres's drug money.

After listening to argument from all counsel, I precluded inquiry into this prior misconduct.

> From what I have heard from what counsel intends to offer the evidence for, that is, on the issue of the witness's credibility, it seems to me that the inflammatory nature of the evidence and the prejudice resulting from it far outweigh[ ] its probative value, given the type of crime, type of bad act that is alleged and weighing against its probative value. Accordingly, it will not be mentioned.

(*Id.* at 8). In response to a follow-up question from Rivera's counsel, I stated that my ruling remained the same for purposes of the Sixth Amendment's Confrontation Clause, adding that I had also factored into my determination the ample opportunity, exclusive of this prior misconduct, for defendants to impugn Damiani's character and challenge his veracity.

▮▮▮▮▮ I have broad discretion in decisions regarding the scope and extent of cross-examination. A "trial judge has 'wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on ... cross-examination based on concerns about, among other things ... interrogation that is repetitive or only marginally relevant.'" *United States v. Maldonado–Rivera*, 922 F.2d 934, 956 (2d Cir.1990) (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986)), *cert. denied sub nom.*, *Ramirez–Talavera v. United States*, 501 U.S. 1211, 111 S.Ct. 2811, 115 L.Ed.2d 984 (1991). "It is settled that 'the scope and extent of cross-examination lies

---

**6.** The discretion afforded a trial judge by the Federal Rules of Evidence dovetails in this respect with her similarly broad discretion, in the context of the Confrontation Clause, to impose reasonable limits on cross-examination. *See United States v. Rosa*, 11 F.3d 315, 335–36 (2d

Cir.1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 1565, 128 L.Ed.2d 211 (1994).

**7.** The government's brief in opposition indicates that the charges were dismissed after Damiani's arrest.

within the discretion of the trial judge.'" *United States v. Scarpa,* 913 F.2d 993, 1018 (2d Cir.1990) (quoting *United States v. Blanco,* 861 F.2d 773, 781 (2d Cir.1988), *cert. denied,* 489 U.S. 1019, 109 S.Ct. 1139, 103 L.Ed.2d 200 (1989)); *see United States v. Rahme,* 813 F.2d 31, 37 (2d Cir.1987) (scope and extent of cross within sound discretion of the court). A trial judge's discretion over cross-examination derives in part from Federal Rule of Evidence 611, which provides:

> (a) *Control by court.* The court shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to (1) make the interrogation and presentation effective for the ascertainment of the truth, (2) to avoid needless consumption of time, and (3) protect witnesses from harassment or undue embarrassment.

> (b) *Scope of cross-examination.* Cross-examination should be limited to the subject matter of the direct examination and matters affecting the credibility of the witness....

Fed.R.Evid. 611. *See United States v. Tutino,* 883 F.2d 1125, 1140 (2d Cir.1989) (the scope and extent of cross-examination lie within the district court's discretion, the exercise of which is guided by Rule 611), *cert. denied,* 493 U.S. 1081, 110 S.Ct. 1139, 107 L.Ed.2d 1044 (1990); *United States v. Bari,* 750 F.2d 1169, 1178–79 (2d Cir.1984), *cert. denied,* 472 U.S. 1019, 105 S.Ct. 3482, 87 L.Ed.2d 617 (1985).

As a threshold matter, I first address the propriety of impeaching a witness with evidence of prior misconduct for which he has been acquitted. The controlling case on this issue in the Second Circuit is *United States v. Schwab,* 886 F.2d 509 (2d Cir.1989), *cert. denied,* 493 U.S. 1080, 110 S.Ct. 1136, 107 L.Ed.2d 1041 (1990). In *Schwab,* the government asked the defendant on cross-examination, "[i]sn't it a fact that you committed income tax fraud in 1970," and "[i]sn't it a fact that you committed perjury in October of 1965?" Schwab answered "no" to both questions. It was then revealed at sidebar

that he had been tried and acquitted of both charges in state court. *Schwab,* 886 F.2d at 510. The trial judge denied the defendant's mistrial motion. On appeal, the Court ruled that although it was harmless error to allow it, this part of Schwab's cross was improper.

Passing on both the collateral estoppel effect of a prior acquittal and on the pertinence of the effect of different standards of proof in the prior (civil) and subsequent (criminal) proceedings, the Court rested its decision on the complimentary "exercise of discretion with respect to admission of prior acts of misconduct" found in Rules 608(b) and 403. *Id.* at 513. The combined effect of Rule 608(b) and 403 analysis—on the admissibility of prior misconduct for which the defendant was acquitted—was distilled as follows: "[w]hether or not an acquittal technically estops the prosecution from eliciting the fact of prior misconduct, it will normally alter the balance between probative force and prejudice, which is already a close matter in many cases where prior misconduct of a defendant is offered." *Id.*

■■■ Similar to the effect of an acquittal,[8] the dismissal of the sexual abuse charge in this case also tips the scales away from probative value and towards. unfair prejudice. Unlike *Schwab,* however, in which the prosecution could point only to the accusation of wrongdoing as a basis for its inquiry, the defendants here can point to the Family Court findings. These findings not only provided the defendants with a reasonable basis to make the inquiry, they also prevented a dispositive tipping of the scales. I therefore do not find on this basis alone that defendants' proposed cross was not probative and therefore properly excluded.

■■■ Prior acquittal or dismissal aside, case law interpreting the express purpose of Rule 608(b) makes clear that not all prior bad acts are admissible to impeach a witness. Such acts are only admissible insofar as they bear on a witness's propensity for truthfulness or untruthfulness, and, even if the prior act does concern the witness's character for

---

**8.** *Schwab* treated an acquittal and dismissal in the same light for purposes of Rule 608(b) impeachment analysis.

truthfulness under Rule 608(b), its probative value must not be substantially outweighed by its unfairly prejudicial effect under Rule 403. Inquiry into Damiani's sexual deviance was not allowed at trial because whatever probative value it may have had would have been substantially outweighed by its prejudicial effect. Upon review of the record, I find that this was the correct ruling.

■ Just as mundane misconduct may be telling of a witness's character for truthfulness, the loathesomeness of prior misconduct does not necessarily bear on the perpetrator's capacity for truth-telling. Cross-examination concerning immoral acts and acts of sexual perversion may be properly excluded by a trial judge who determines they are not probative of the witness's veracity. In *United States v. Rabinowitz*, 578 F.2d 910 (2d Cir.1978), the trial court was found to have properly prohibited cross-examination into the witness's prior acts of sodomy of young children. The Court of Appeals wrote that "[w]e fail to see the logical relevance of the evidence sought to be adduced ... to the credibility of the witness. The evidence's bearing on the witness's propensity to tell the truth was simply too tenuous for us to hold that the district judge abused his discretion in excluding it." *Rabinowitz*, 578 F.2d at 912 (citations omitted). *See United States v. Rosa*, 11 F.3d 315, 336 (2d Cir.1993) (no abuse of discretion to exclude from cross-examination evidence of rape "as having an insufficient bearing on the witness's credibility"), *cert. denied*, —— U.S. ——, 114 S.Ct. 1565, 128 L.Ed.2d 211 (1994); *Eng v. Scully*, 146 F.R.D. 74 (S.D.N.Y.1993) ("Murder is not necessarily indicative of truthfulness, and the probative value of a murder conviction is substantially outweighed by the danger of unfair prejudice.").

■ As at trial, I do not find now that Damiani's abuse of his stepdaughter lacked any probative value as to his truthfulness as a witness. *See Morello v. James*, 797 F.Supp. 223, 228 (W.D.N.Y.1992) (in which magistrate judge applying Rule 403 in tandem with Rule 609 to address the probative value of a prior conviction "ha[d] substantial difficulty with the proposition that rape, particularly the kind of rape and abuse of one's

own children that is present here, does not bear on plaintiff's credibility"). *Some* probative value, however, is not necessarily enough to overcome a Rule 403 balancing test. *See Scarpa*, 913 F.2d at 1017–18. Accordingly, I find now, as at trial, that any probative value of the proposed cross-examination was substantially outweighed by its prejudicial effect on the jury. *See United States v. Tillem*, 906 F.2d 814, 827 (2d Cir.1990) (affirming restriction of cross-examination on alternative grounds that prior misconduct was not probative of truthfulness, and that any probative value would have been outweighed by prejudicial effect). Inquiry into Damiani's repeated rape of his stepdaughter would have undoubtedly inflamed the jurors' prejudice against him, their understandable emotional response to an event otherwise factually unconnected to his testimony or the facts of the case eclipsing whatever veracity he may otherwise have had in their eyes. *See United States v. Young*, 567 F.2d 799, 803 (8th Cir. 1977) (affirming preclusion of cross-examination into witness's alleged offer to pay $10,-000 to have her ex-husband killed as irrelevant to veracity and "highly prejudicial"), *cert. denied*, 434 U.S. 1079, 98 S.Ct. 1273, 55 L.Ed.2d 786 (1978).

■ Under Rule 403, several factors weigh in favor of restricting defendants' cross-examination of Damiani, including: the misconduct was not on its face an act of falsehood, fraud, or deceit which would clearly speak to the witness's truthfulness; the misconduct was relatively remote in time (occurring about seven years before trial); and the nature of the misconduct was highly inflammatory. See Saltzburg, *et al.*, at p. 844 (listing factors). Most importantly, defendants were allowed ample opportunity to impeach Damiani on other grounds. It is well-established that "a trial judge does not abuse his discretion by curtailing cross-examination as long as the jury has 'sufficient information to make a discriminating appraisal of the particular witness's possible motives for testifying falsely and in favor of the government.'" *Scarpa*, 913 F.2d at 1018 (quoting *United States v. Singh*, 628 F.2d 758, 763 (2d Cir.), *cert. denied*, 449 U.S. 1034, 101 S.Ct. 609, 66 L.Ed.2d 496 (1980)). In *Scarpa*, the

trial judge granted the government's pretrial motion to limit the cross-examination of one of its witnesses to prevent inquiry into his involvement in an attempted contract murder. On cross, however, defendants were able to bring out the witness's involvement in drug dealing (even after agreeing to cooperate with the government), and his arrests for possession and distribution of marijuana, burglary, credit card fraud, sale of stolen goods, and arson (again, after having agreed to cooperate). The Court of Appeals found no abuse of discretion in the exclusion of the contract murder line of questioning, "[e]specially in light of this searching cross-examination." *Id.* at 1018; *see also Rosa,* 11 F.3d at 336; *Tillem,* 906 F.2d at 828 (finding that even if precluded inquiry was admissible under Rule 608(b), exclusion under Rule 403 was proper when cross-examination which elicited witness's involvement in money-skimming schemes, tax evasion, and "front money" scheme was "more than sufficient to bring the issue of Witlow's credibility to the jury's attention"); *United States v. Lanese,* 890 F.2d 1284, 1289 (2d Cir.1989) (finding no denial of defendant's right to fair trial, despite restriction of cross-examination addressing government witness's credibility, when jury learned that witness was in government protection program, had received immunity and money in return for his cooperation, was a compulsive gambler indebted to the IRS, and jury also "had the benefit of observing [witness's] demeanor"), *cert. denied,* 495 U.S. 947, 110 S.Ct. 2207, 109 L.Ed.2d 533 (1990); *Blanco,* 861 F.2d at 781 (no abuse of discretion to preclude inquiry into witness's alleged involvement in murder when inquiry was allowed into witness's cooperation with the government, extensive career as drug dealer, and numerous past acts of lying, stealing, and defrauding); *Bari,* 750 F.2d at 1179 (no prejudice to defendants precluded from certain impeachment inquiry when grueling cross-examination did elicit the witness's numerous convictions, his refusal to reveal income sources, the government's rejection of an earlier offer of cooperation because it concluded witness was lying, and that witness offered to cooperate only to benefit himself).

In this case, Damiani was subject to thorough, probing, and effective cross-examination. This cross elicited testimony concerning Damiani's: (1) extensive record as a career criminal (Tr. 1614–16), including an admission that he had spent his "entire adult life as a criminal," (*id.* at 1608–09); (2) repeatedly filing false tax returns, (*id.* at 1610–11); (3) longtime, lucrative involvement in the cocaine and heroin trades, (*id.* at 1616, 1621–24); (4) assumption that heroin he had distributed had caused deaths, (*id.* at 1627); (5) allowing his wife to be arrested and charged with the possession of three guns which he owned in order to avoid going to jail himself, (*id.* at 1629–31); (6) ties to the Genovese crime family, (*id.* 1631); and (7) having entered a cooperation agreement with the government ("to help the government convict Joe Devery," (*id.* at 1651)) in his own self-interest and hoping thereby to be rewarded with a reduced sentence (*id.* at 1617–20, 1627–28). This testimony provided a compelling basis for the jury to question Damiani's credibility.

In light of the damning personal history elicited on cross, the slight probative weight of the precluded testimony, and the inflammatory nature of the precluded testimony, in addition to other factors discussed above, I find that the cross-examination of Damiani was properly restricted pursuant to Rules 608(b) and 403, and that the restriction in no way impaired the defendants' right to confront the witness.

### III. Jury Deliberations

■ On the morning of November 30, 1995, the eighth and last day of jury deliberations, three notes were sent out from the jury room when only 11 jurors were present, the twelfth having not yet arrived. The notes asked to see certain documents in evidence and for the readback of certain testimony. In comparison to notes received earlier that week from the jury, which asked more substantive and complex questions about the Indictment and about juror unanimity, these three notes were more mechanical in their requests and did not on their face indicate that they were the result of deliberations that morning.

In response to these notes, defendant Devery's counsel immediately moved for a mistrial, stating that he believed they were the product of the deliberation of less than the full jury.[9] Defendant Rivera's counsel also moved for a mistrial. The government objected, arguing that rather than the result of actual deliberation that morning, the notes could have been either the product of the previous night's deliberations or the requests, without deliberation, of an individual juror. The government therefore suggested that the Court lacked sufficient information to make a ruling on the defendants' motion for a mistrial and needed to make an inquiry of the jury in order to ascertain more clearly the process leading up to the notes. The government further suggested that this inquiry, in the form of a note from the Court, should ask whether the three jury notes were the product of the previous night's deliberation or deliberation that morning in the absence of the twelfth juror. Devery's counsel argued that the very use of the word "deliberate" might be confusing to the jury and favored sending in a note inquiring, in general terms, whether the jury's notes were the results of "discussions" that morning. The government alternatively suggested calling the foreperson for an *in camera* inquiry into what precipitated the notes. Rivera's counsel objected to any direct intrusion into the jury room and favored reserving on the motion, continuing with deliberations of the full jury, and waiting until after a verdict was returned to resolve the matter.

Considering these concerns, and with further input from counsel, I decided to send in a note which asked four separate questions, each followed by the words "Yes" and "No," and with the instruction "Please circle the appropriate response." The note read:

Ladies and Gentlemen:

Are the notes you sent out this morning:

1. The results of deliberations of all twelve jurors on Wednesday, November 29?

2. The results of deliberations of fewer than twelve jurors?

3. Inquiries requested by one or more individual jurors for their own assistance?

4. The result of some other process?

The jury answered "Yes" to question one, "No" to question two, "Yes" to question three, and "No" to question four.

This note was designed to yield more information on the process leading to the three notes, without swaying the jury and without inviting a response that would reveal anything more substantive about the status of the deliberations. I felt that it was necessary, once the motion for a mistrial was made, to determine more fully what had occurred in the jury room that morning, particularly whether the three notes were residual products of the previous night's deliberations, simply requesting specific documents and testimony while waiting for the twelfth juror; or whether they reflected individual juror requests (two of the notes were in the same handwriting, none was signed); or whether they were the result of an informal discussion between two or three jurors who decided they would like to review the requested materials. I rejected the phrasing suggested by Devery's counsel about whether any "discussion" had occurred as too generalized to elicit any useful information without requiring an elaborate response or further follow-up questions. I also reject defendants' present argument that the note sent in was "leading" in that it suggested a "correct answer that would avoid a mistrial." Devery Mem. in Reply at 12. Furthermore, there is not one scintilla of evidence that the verdict reached that day, after eight days of deliberation, was not the verdict of a unanimous jury.

I find now, as at trial, that the note sent by the Court to the jury in response to the three notes received on the morning of November 30th clearly revealed that the jury had not engaged in deliberation in the absence of a full jury. By order dated December 1, 1995, the defendants' motions for a mistrial on the ground that the jury engaged in deliberations with fewer than all twelve jurors were

---

**9.** The following discussion relates an *in camera* conference which is transcribed on pages 3706– 3725 of the transcript.

denied. After reviewing the record, I find that there is no reason to come to any other conclusion now.

## IV. Newly Discovered Evidence: Perjured Testimony

### A. Torres's Hidden Drug Money

On March 13, 1996, this Court received a letter of that date notifying me that Robert Torres had committed perjury while testifying on behalf of the government. The letter read, in its entirety,

> [t]he Government respectfully submits this letter to apprise the Court and counsel that Robert Torres, who testified in the trial of the above-referenced case in October 1995, knowingly provided false testimony during trial as to one issue. Specifically, on re-cross examination, Torres testified that he did not have any money hidden away from the Government. (Tr. 573). While he conceded that he probably would not tell the Government even if he did have such money hidden away, he testified that he had no such money. (Tr. 573–74). Based upon an interview with Torres yesterday, the Government learned that Torres in fact has approximately $80,000 in cash that he has kept hidden from the Government.

(March 12, 1996 letter to Judge Preska from Assistant U.S. Attorney Tai H. Park.)

Federal Rule of Criminal Procedure 33 states that a timely motion for a new trial may be granted "if required in the interest of justice." Fed.R.Crim.Pro. 33. Rule 33 specifically provides that "newly discovered evidence" may provide the basis for such a motion.

■ When newly discovered evidence reveals that testimony given at trial was perjured, the grant of a new trial depends on two factors: "the materiality of the perjury to the jury's verdict and the extent to which the prosecution was aware of the perjury."

*United States v. Wallach,* 935 F.2d 445, 456 (2d Cir.1991), *cert. denied,* 508 U.S. 939, 113 S.Ct. 2414, 124 L.Ed.2d 637 (1993). As to the second factor, if the government was unaware of the perjury during the trial, then "a new trial is warranted only if the testimony was material and 'the court [is left] with the firm belief that but for the perjured testimony, the defendant most likely would not have been convicted.'" *Id.* (quoting *Sanders v. Sullivan,* 863 F.2d 218, 226 (2d Cir.1988)). If, however, the government knew or should have known of the perjury at the time of the trial, then "the conviction must be set aside 'if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury.'" *Id.* (quoting *United States v. Agurs,* 427 U.S. 97, 103, 96 S.Ct. 2392, 2397, 49 L.Ed.2d 342 (1976); *see United States v. Wong,* 78 F.3d 73, 81 (2d Cir.1996); *United States v. Stofsky,* 527 F.2d 237, 245–46 (2d Cir.1975), *cert. denied sub nom., Hoff v. United States,* 429 U.S. 819, 97 S.Ct. 65, 50 L.Ed.2d 80 (1976).

■ Both defendants have requested that a hearing be held in order to determine whether the government knew or should have known of Torres's perjury. For purposes of this motion, without passing on the merit of this request,[10] I will assume that the government should have known that Torres gave false testimony. This aspect of defendants' motions will thus be weighed under the more lenient "reasonable likelihood" standard.

■ Several principles have been enunciated by the Court of Appeals as useful in determining whether "the interest of justice" requires overturning a jury's decision to convict and granting a Rule 33 motion for a new trial. First, the evidence must demonstrate that the witness in fact committed perjury. *United States v. White,* 972 F.2d 16, 20 (2d Cir.) (citation omitted), *cert. denied,* 506 U.S. 1026, 113 S.Ct. 669, 121 L.Ed.2d 593 (1992).

---

10. Defendant Devery argues that it was "within the Government's power" to determine if Torres had money hidden away but that it failed to investigate that possibility adequately. Deft.Devery Supp.Mem. at 12–13. Devery also states that "[i]t was not clear whether defendant could have discovered the alleged perjury prior to or during

trial." *Id.* at 12. Defendant Rivera, admitting that "it is difficult to determine from this record," Rivera Mem. in Support at 27, nevertheless argues that "[t]he government knew or should have known that Torres had hidden assets based upon the fantastical [sic] amount of money that he had made in the heroin trade." *Id.*

The government here, as evidenced by its March 13, 1996 letter to the Court, concedes that Torres committed perjury. Second, the motion will not be granted if the "newly discovered" evidence could have been discovered by the movants before or during trial. *Id.* Third, the newly discovered evidence must be "material." *Id.* Fourth, "consideration must also be given to whether the newly discovered evidence is cumulative." *Id.* at 21; *see United States v. Moore,* 54 F.3d 92, 99 (2d Cir.1995) (movant must show that witness committed perjury, that new evidence was not previously discoverable with due diligence, and that new evidence is material and noncumulative), *cert. denied,* —— U.S. ——, 116 S.Ct. 793, 133 L.Ed.2d 742 (1996). In practice, the third and fourth principles are closely related to the controlling issue in such cases: "the effect the evidence would have on the jury's verdict had it been submitted at trial." *White,* 972 F.2d at 21. The standard to gauge this effect, as described above, depends on the government's knowledge of the perjury, which is assumed here. If Devery and Rivera can show that there is a reasonable likelihood that Torres's false testimony could have affected the jury's decision to convict them of conspiracy to violate the money laundering laws, then they are entitled to a new trial.

Torres's perjurious testimony was elicited during cross-examination by Rivera's counsel. The pertinent exchange was as follows:

Q: Mr. Park gave you a list of some of the benefits you were getting by virtue of your agreement, right?

A: Correct.

Q: One of the benefits is that if you got any money hidden away, you're going to be able to keep it, right?

A: I don't remember having talked about that. And if I had it, I wasn't going to tell them either. I don't have it.

Q: And if you had it, you would tell them, right?

A: Well, if I had the money, I have to be honest, I wouldn't tell them.

Q: And when you tell us you don't have the money, you have to be honest too, right?

A: Because I am telling the truth.

Q: They haven't caught you with any extra money, have they?

A: No.

(Tr. 573–74). Aside from this exchange, no further testimony was elicited about whether Torres had concealed money from the government.

■ After reviewing the record, I find that there is no reasonable likelihood that Torres's false testimony could have affected the jury's verdict, for three primary reasons.

First, the fact that Torres lied to the government about money he concealed is clearly a collateral matter, stemming not from the money laundering charges brought against the defendants or from his dealings with the defendants as described at trial, but rather from his own relationship with the government as a cooperating witness after he had agreed to cooperate as a witness. The perjury does not contradict any factual aspect of the government's case. *See White,* 972 F.2d at 20 ("The importance of such evidence is, of course, lessened when the perjury involves some collateral matter concerning the witness, rather than testimony about facts relevant to the merits of the case."); *United States v. Spencer,* 4 F.3d 115, 119 (2d Cir. 1993) ("The discovery of new evidence which merely discredits a government witness and does not directly contradict the government's case ordinarily does not justify the grant of a new trial.") (citations omitted).

Second, Torres's testimony, while clearly important, was not an indispensable component of the government's case. Without reviewing here all the pertinent testimony from the eight-week trial, I note that although Torres, as the kingpin of the heroin ring exposed by the government, was the ultimate source of the money which the defendants conspired to launder, and thus deeply invested in seeing that the money was laundered, it was the testimony of other witnesses—including John Chapel, Anthony Damiani, and Hector Roman—which most directly tied Devery and Rivera to the crimes charged. Torres supplied a useful bird's-eye-view of his organization, but the foundation of the

government's case was carefully built from the ground up on the strength of other persuasive testimony and numerous documents which tied the defendants to the laundering of unlawfully gained money. As the Court of Appeals recently wrote in *United States v. Wong, supra,*

> [n]o doubt, new impeachment evidence may satisfy the "reasonable likelihood" standard where a conviction depends on the testimony of a single government witness, or on a witness whose credibility was not attacked on cross-examination. *See, e.g.,* [*Wallach,* 935 F.2d] at 457–58; *Stofsky,* 527 F.2d at 246 (recognizing possibility that new evidence regarding credibility of witness may warrant new trial). But where *independent evidence supports a defendant's conviction, the subsequent discovery that a witness's testimony at trial was perjured will not warrant a new trial. See, e.g., United States v. Reyes,* 49 F.3d 63, 68 (2d Cir.1995) (where government agent subsequently discovered to have perjured himself, new trial not warranted where "core of the evidence" came from a different witness).

*Wong,* 78 F.3d at 82.

Third, I find that the perjury only adds cumulative evidence to impeach Torres's credibility. Torres was subject to rigorous and effective cross-examination from both defendants' counsel. As the defendants point out, and as the government acknowledges, on several occasions the pressure of these examinations revealed clear inconsistencies or contradictions in his testimony. On this basis alone, and particularly when coupled with Torres's thoroughly examined appalling character, the jury already had ample reason to question the witness's credibility. Furthermore, in addition to a general instruction on credibility, the jury charge included six separate cautionary instructions on: accomplice testimony, testimony of co-defendants who pleaded guilty, testimony of co-defendants who entered into a cooperation agreement, impeachment by felony conviction, impeachment by prior inconsistent statements, and testimony of witnesses using or addicted to drugs. All of these charges

put the jury on notice to consider carefully Torres's credibility.

More importantly, Torres's credibility was roundly challenged by the defendants in their opening statements and, with particular stringency, their closing statements. For its part, the government devoted a considerable amount of time throughout its case to resuscitating Torres's character and stressing his motivation for telling the truth, that is, his cooperation agreement and his hopes for leniency in sentencing. In total, literally hours of trial time, in the presence of what I observed to be an especially keen and conscientious jury, were devoted to Torres's credibility. To add to this record—already rife with testimony and argument about whether or not Torres's longtime status as the terribly successful and ruthless kingpin of a violent and destructive heroin ring belied his credibility—evidence that he lied to the government when he said he had no money stashed away would be merely cumulative and not reasonably likely to change the jury's verdict.

Observations from the Court of Appeals in the *White* case are instructive here:

> [t]he verdict demonstrates that the jury did not rely on Smith's testimony alone to convict White. The district court correctly held that the newly discovered evidence that Smith may have lied about his drug use in 1990 and 1991 would have been merely the sort of cumulative impeachment material that is routinely held insufficient to warrant a new trial. *See Shotwell Mfg. Co. v. United States,* 371 U.S. 341, 357 [ ] 83 S.Ct. 448, 458, 9 L.Ed.2d 357 (1963) ("This is not a case ... where a conviction may be regarded or is conceded to have rested on perjured testimony. To overturn the denial of a new trial in this case ... would be tantamount to saying that any subsequently discovered inaccuracy in the testimony of an important trial witness, which might have affected his credibility in the eyes of the jury, would entitle a convicted defendant to a new trial. We cannot so hold." (footnote omitted)); *United States v. Petrillo,* 821 F.2d 85, 90 (2d Cir.1987).

*White,* 972 F.2d at 22; *see United States v. Reyes,* 49 F.3d 63, 68 (2d Cir.1995) ("New

evidence that is merely impeaching will not ordinarily justify a new trial.") (citations omitted).

My determination is pointedly supported by the circumstances of the perjury itself. Even as he lied by denying he had hidden any money from the government, Torres flatly asserted, not once but twice, that even if he did have money hidden away, he would not have informed the government. His candid answers were clear warning bells to the jury that his testimony on this collateral issue should be carefully scrutinized. As already indicated, Torres's perjury here goes solely to his credibility. Although mindful that the credibility of a key government witness can by itself play "a factor of central importance" in the conviction of the accused, *Stofsky*, 527 F.2d at 243; *see United States v. Seijo*, 514 F.2d 1357, 1364 (2d Cir.1975) ("The taint of ... false testimony is not erased because his untruthfulness affects only his credibility as a witness. 'The jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence....'") (quoting *Napue v. Illinois*, 360 U.S. 264, 269, 79 S.Ct. 1173, 1177, 3 L.Ed.2d 1217 (1959)), *cert. denied*, 429 U.S. 1043, 97 S.Ct. 745, 50 L.Ed.2d 756 (1977), I find that the cumulative impeachment of Torres latent in the newly discovered evidence of his perjury does not make it reasonably likely that the jury would not have found Devery and Rivera guilty on the conspiracy charge. I make this finding primarily in light of the important, but not crucial, nature of Torres's testimony, the already ample grounds, heavily stressed by defendants, to question his veracity, the fleeting and collateral nature of the matter Torres lied about, and the witness's own testimony that he was not inclined to tell the truth of the matter in any event. *See Wong*, 78 F.3d at 82 (affirming denial of new trial because "circumstances do not suggest that the undisclosed evidence of [a star witness's] perjury would have affected the result").

Turning to the primary cases relied on by defendants, I find them distinguishable on several important points. For example, in *United States v. Wallach, supra,* the perjured testimony came from a witness who was the "centerpiece of the government's case." *Wallach,* 935 F.2d at 457. On direct examination, the witness falsely testified that he had overcome a compulsive gambling habit and "undergone a moral transformation." *Id.* When confronted on cross examination with strong evidence that his moral transformation was a sham and in fact he had continued to gamble, the witness persisted in his lie. On redirect, the government engaged in a line of questioning meant to explain away the damaging evidence introduced on cross.

The reviewing Court was "convinced that the government should have known that [the witness] was committing perjury." *Id.* In reversing the convictions, the Court relied on several factors not present in this case: (a) the witness held himself out as having undergone a "moral transformation," (b) the witness persisted in his lie, even when confronted with contradictory evidence on cross-examination, and (c) the witness's testimony was "essential" to the government's case. *Id.* at 458. Similar facts are absent here.

In *United States v. Seijo, supra,* the perjurious witness gave false testimony about his criminal record, denying on cross-examination that he had been arrested while in the Army for using marijuana.[11] Again, this witness provided the "essence of the government's case." *Seijo,* 514 F.2d at 1358. Despite finding that marijuana possession paled in comparison to hard drug crimes, and despite ample reason already on the record for the jury to have questioned the witness's credibility—including his having pleaded guilty on the first morning of the trial and having admitted to using opium and being addicted to and selling heroin—the Court found that his "false denial ... on the wit-

---

11. I first note that this case was heard on appeal, rather than as a Rule 33 motion. Second, because a criminal identification sheet which revealed that the witness had lied about his record had been received by the government but misfiled, the Court treated the appeal in the context of the unintentional suppression of evidence fa-

vorable to defendant. Third, the Court applied the slightly different, though instructive, test of whether "there was a significant chance that this added item, developed by skilled counsel ... could have induced a reasonable doubt in the minds of enough jurors to avoid a conviction." *Seijo,* 514 F.2d at 1364 (citation omitted).

ness stand of his prior conviction has a different and more serious bearing." *Id.* at 1363. The witness's "false concealment of any criminal record in his adult life," *id.* at 1364, if made known to the jury, would have seriously undermined the government's argument that he was only a "kid," that "[h]e was younger, he was innocent," *id.* at 1362.

Unlike *Seijo,* the present case is not one in which "the reliability of a particular witness may be determinative of guilt or innocence." *Id.* at 1364. Nor could any juror reasonably have thought, and the government did not suggest, that Torres's record was the product of youthful, innocent transgressions; his perjury, unlike *Seijo,* does not add a particularly cogent refutation of any aspect of his testimony or the government's theory of the case. I find that the perjured testimony here, particularly clothed as it was in Torres's express aversion to the truth, would not have affected the jurors' impression of his credibility in such a way as to have been reasonably likely to affect their judgment. Furthermore, I cannot find, as did the *Seijo* Court, that the defendants' convictions "are essentially predicated on the now suspect credibility of the crucial [perjurious] witness." *Id.*

▮ The defendants' motion for a new trial on the basis of newly discovered evidence—a motion that is disfavored in this Circuit, *see, e.g., United States v. Gambino,* 59 F.3d 353, 364 (2d Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 1671, 134 L.Ed.2d 776 (1996), "viewed with great caution," *United States v. Myers,* 534 F.Supp. 753, 755 (S.D.N.Y.1982) (citations omitted), and only granted "in the most extraordinary circumstances," *Sanders,* 863 F.2d at 225 (quoting *United States v. DiPaolo,* 835 F.2d 46, 49 (2d Cir.1987)—is denied). After sitting through an eight-week trial in which the government put on a strong case built through many important witnesses, and having reviewed a record replete with detailed documentary evidence, I find that the defendants' convictions were not bottomed on Torres's testimony, in either its factual or credibility components, in such a way as to justify undoing the jury's verdict. And even if Torres was, as in *Wallach* and *Seijo,* the "essen-tial" government witness, the cumulative nature of the newly discovered impeachment evidence, the collateral nature of the matter lied about, and Torres's admission that he was not inclined to answer truthfully about hidden money would lead me to the same conclusion.

**B. Torres's Real Estate Purchases**

In a letter received by the Court on July 15, 1996, Rivera's counsel stated that he had reason to believe that he had uncovered additional newly discovered evidence that Torres had committed perjury. Counsel was given until July 19th to file an affidavit and supporting materials setting forth the basis for this assertion. The government was given until July 24th to respond.

The supplemental affidavit alleges that Torres gave false testimony about Rivera's involvement in the purchase by Torres of a house in New Rochelle.

> The newly discovered evidence that serves as the basis for this supplemental motion are deeds and mortgages relating to the Pelham properties located in New Rochelle, New York. Torres testified that Mr. Rivera played a role in the purchase of all the New Rochelle properties. However, the deeds and mortgages reveal that Mr. Rivera was not involved, [sic] in the purchase of all these properties, directly refuting Torres's testimony.

Affidavit in Support of Supplemental Motion for a New Trial ("Supp.Aff."), dated July 18, 1996, at ¶ 3. Rivera does not deny that, in his capacity as an attorney, he helped Torres purchase a house at 285–297 Pelham Avenue. What Rivera says caught him by surprise, and what constitutes the alleged perjury, was Torres's testimony that Rivera also helped him purchase "other" New Rochelle property, near the first, at the intersection of Pelham Road and Leland Avenue.

> From the defense perspective[,] Torres's testimony that he delivered an [sic] $100,-000 to Mr. Rivera's office for the purchase of 'other' Pelham properties was unexpected. Mr. Rivera knew that Torres made no such delivery. Mr. Rivera also knew that

he was only involved with the closing of the property located at 295–297 Pelham Road as the attorney representing the bank.

Supp.Aff. at ¶ 15 (emphasis added).

The challenged testimony, elicited by the government during direct examination of Torres, went as follows:

Q. After you delivered the money to Mr. Rivera's office, what was the next thing that you did in connection with your purchasing the Pelham properties?

A. He and Chapel took care of everything in order to do the closing. Then I believe I went back a second time.

MR. LEWIS: Objection.

I move to strike as nonresponsive.

THE COURT: I will permit it.

The motion to strike is denied.

Q. When you went back, what happened?

A. I took an additional $100,000 in order to purchase the other two properties.

Q. Do you recall the addresses of the other two properties at Pelham?

A. I don't remember the exact number, but they were on Pelham and I believe the other street or corner is Leland.

(Tr. 227–28).

Rivera's supplemental submission strains credulity. I find not only that the testimony cited is not perjurious, but that the evidence underlying this allegation is not newly discovered. See Section IV.A, *supra*, discussing *United States v. White*, 972 F.2d 16, 20 (2d Cir.), *cert. denied*, 506 U.S. 1026, 113 S.Ct. 669, 121 L.Ed.2d 593 (1992).

█ As to the whether the challenged testimony is perjurious, Rivera has produced evidence that he was not the lawyer who participated in the closing of the Pelham Avenue/Leland Avenue property. Exhibits C and D to Rivera's supplemental affidavit are a deed and a mortgage for the Pelham/Leland Avenue property. Each is signed by an attorney other than Rivera. First, I am not convinced that these documents even contradict Torres's testimony.

Torres testified that, after an introduction arranged by John Chapel, Torres twice visited Rivera carrying $100,000 in a paper bag and that he gave this money to Rivera for the purchase of the 295–297 Pelham Road property and, about a month later, the Pelham Road/Leland Avenue property. Concerning the 295–297 Pelham Road property, Torres testified that Rivera "said he would help Chapel in order to draw up the papers." (Tr. 223). Torres also testified that "[Rivera] and Chapel took care of everything in order to do the [first] closing. Then I believe I went back a second time." (*Id.* at 227–28). Concerning the second purchase, Torres recalled only that he delivered the money, Rivera accepted it, and Rivera told him "that the papers were going to be drawn up." (*Id.* at 230). Torres did not testify that Rivera himself drew up the papers, or that Rivera told him he would draw up the papers, or that Rivera even said he would be at the closing. It does not directly contradict Torres's testimony that the deed and mortgage for the Pelham Road/Leland Avenue property are not signed by Rivera.

Even if the newly offered evidence directly contradicts Torres's testimony, Rivera has offered an inadequate basis from which to conclude that Torres knowingly gave false testimony. It is more likely from the record that he was simply mistaken. Rivera and the government agree, as do I, that even at the time it was given, Torres's testimony on this point was confused and inconsistent. For example, Torres was confused about the number of houses he purchased. He described the house at 295–297 Pelham Road as a "double house." (*Id.* at 219). He recalled that there were two houses on the property "next to" it, namely, the Pelham Road/Leland Avenue parcel. (*Id.*). He therefore testified that he was interested in four houses. (*Id.*). In fact, there was only one house on the Pelham Road/Leland Avenue property. Torres also testified that he purchased the Pelham Road/Leland Avenue property after the 295–297 Pelham Road property and after meeting Rivera. The deed and mortgage now offered by Rivera show that this purchase preceded both events. At other times, Torres and the government seemed to use

the words "properties" and "houses" interchangeably, or failed to distinguish clearly between "the Pelham property" and "the Pelham properties." (*Id.* at 220–231). In response to the government's question about his purchase of a "house," Torres referred to the purchase of "houses." (*Id.* at 222). And as already stated, he was not certain of the exact address of the Pelham Road/Leland Avenue house. Furthermore, Torres's testimony makes clear that, aside from delivering the cash for the deals, he was detached from the details of these purchases. He testified, for example, that "[Rivera] and Chapel took care of everything" for the 295–297 Pelham Road closing, which Torres did not attend.

This confusion was not helped by John Chapel's testimony. Chapel, who was directly involved in both purchases, gave testimony that conflicted with Torres's on such points as the number of houses purchased and the amount of cash brought to Rivera, as well as "the description of the properties, and the identity of the purchasers." Supp.Aff. at ¶ 17.

Although it was immediately apparent to Rivera, he addressed none of this confusion during cross-examination of Torres or Chapel. Rivera did not cross Torres on the specific address of the Pelham Road/Leland Avenue property or the particulars of that transaction. The government had offered documentation underlying the 295–297 Pelham Road purchase; Rivera did not inquire from the government if it had any documentation concerning the Pelham Road/Leland Avenue purchase, or otherwise note its absence. The deed and mortgage now offered by Rivera, for the absence of his signature, reveal that Torres was mistaken about certain aspects of the Pelham Road/Leland Avenue purchase, including when it occurred, and unclear about others, such as the exact address. But nothing in this evidence or in the record indicates that Torres knowingly gave false testimony. I find therefore that the challenged testimony was not perjurious.

Secondly, I find that the evidence offered by Rivera is not "newly discovered," as required by Rule 33. I reject Rivera's contention that the deed and mortgage to the Pel-

ham Road/Leland Avenue property could not have been discovered sooner through the exercise of due diligence. Rivera relies on the above-described confusion and errors in Torres's testimony to excuse the 41–week delay between the giving of the testimony on September 28, 1995 and his letter to the Court on July 15, 1996. Rivera claims that because "Torres did not testify as to exact addresses[,] . . . the defense could not readily ascertain to what property Torres referred." Supp.Aff. at ¶ 15. Torres testified that the "other" property was located at Pelham Road and Leland Avenue. The deed now offered by Rivera confirms that, in fact, that is where the property is located: 305 Pelham Road and 100 Leland Avenue. Identified as "Parcel E," this property is described as "beginning at a point on the westerly side of Pelham Road . . . connecting with the northeasterly side of Leland Avenue, said point also being the intersection of the westerly side of Pelham Road." Supp.Aff. at Exh. C. This was hardly a search for a needle in a haystack. Rivera cannot expect me to believe that an attorney experienced in real estate matters, with the help of a seasoned counsel, and with or without the further help of an investigator, all exercising due diligence, needed forty-one weeks to pinpoint this property. This argument is particularly undermined by the fact that neither during trial—and there was six weeks of trial following the challenged testimony—nor at any time afterward did Rivera even inquire from the government for documents concerning the Pelham Road/Leland Avenue property. Due diligence would have most expeditiously began with such an inquiry.

Rivera admits that "the property records at issue were on file with the Westchester County Clerk before and during Mr. Rivera's trial." Supp.Aff. at ¶ 20. His description of how he came about the newly discovered evidence of Torres's alleged perjury do not support his contention that "Torres's and Chapel's testimony concerning the purchase of the properties at issue was so convoluted that Mr. Rivera should not be prejudiced for being unable to locate the evidence earlier." *Id.* Rivera says he spent "hours," not days

or weeks or months, searching the records at the County Clerk's Office. After an unspecified number of hours, "a clerk revealed the existence of a computer terminal," *Id.* ¶ 19. How the computer was concealed is not told, but using the names Torres and Chapel, the address, deeds, and mortgages now offered were "finally" located. *Id.*

I can only assume that aside from the "hours" he spent at the Clerk's Office, Rivera spent many more hours between September 28, 1995 and July 15, 1996 combing over the record.

> After reading and re-reading the trial transcript and carefully comparing Torres [sic] and Chapel's testimony following his conviction, Mr. Rivera became convinced that Torres lied about the purchase of these "other properties." A subsequent investigation revealed that Torres committed perjury.

*Id.* at ¶ 18. The subsequent investigation took only "hours." Case law applying Rule 33 does not provide for a tolling of the due diligence clock while a convicted defendant reads and re-reads the record. In this case, that it took so long for Rivera to convince himself that Torres lied belies the significance of the challenged testimony to the jury's decision to convict him. More forcefully refuting Rivera's argument that the confusion of Torres's and Chapel's testimony justified the 41-week search for the deed and mortgage now offered is the fact that Rivera says he knew from the moment that Torres gave the testimony, on September 28, 1996, that it was false.[12] From then, even without asking the government for an offer of proof on this purchase, it should only have taken "hours" to disprove Torres's claims. Now, thirty-two weeks after the jury voted to convict, it is too late to offer this "newly discovered" evidence as a supplemental basis for a new trial—even if, and I have found it does

not, the evidence demonstrated that Torres committed perjury.

### CONCLUSION

For the reasons stated above, defendants' motions for a judgment setting aside the verdict or for new trial are denied.

SO ORDERED.

---

12. As noted above, Rivera's affidavit states that, as to Torres's testimony about the Pelham Road/Leland Avenue purchase and the second hand-delivery of $100,000 in cash, "Mr. Rivera knew that Torres made no such delivery. Mr. Rivera also knew that he was only involved with the closing of the property located at 295–297 Pelham Road. . . ." Supp.Aff. at ¶ 15. Nevertheless, in his initial memorandum in support of his motion for a new trial, dated May 1, 1996, Rivera refers to this same piece of testimony without suggesting that it was inaccurate or that Torres knowingly lied. See Rivera Mem. in Support at 7.